Dowling Aaron Incorporated
Donald R. Fischbach, Bar No. 053522
dfischbach@dowlingaaron.com
Mark D. Kruthers, Bar No. 179750
mkruthers@dowlingaaron.com
8080 N. Palm Avenue, Third Floor
Fresno, California 93711
Telephone: (559) 432-4500

Payne & Fears LLP
C. Darryl Cordero, Bar No. 126689
cdc@paynefears.com
Scott O. Luskin, Bar No. 238082
sol@paynefears.com
Matthew K. Brown, Bar No. 252503
mkb@paynefears.com
Leilani E. Livingston, Bar No. 298896
llj@paynefears.com
1100 Glendon Avenue, Suite 1250
Los Angeles, California 90024
Telephone: (310) 689-1750

Marko & Magolnick, P.A
Joel S. Magolnick, Bar No. 776068
magolnick@mm-pa.com
3001 S.W. 3rd Avenue
Miami, Florida 33129
Telephone: 305-740-1967

Attorneys for Plaintiff Dakota Medical, Inc., dba Glenoaks Convalescent Hospital

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

R. FELLEN, INC., *et al.*,

Plaintiffs,

v.

REHABCARE GROUP, INC., *et al.*,

Defendants.

Case No.: 1:14-cv-02081-DAD-BAM

**Memorandum of Points and Authorities in Support of Plaintiff's Unopposed Motions for Preliminary Certification of Settlement Class and for Preliminary Approval of Class Action Settlement**

**Judge:** **Hon. Dale A. Drozd**
**Date:** **April 18, 2017**
**Time:** **9:30 A.M.**
**Courtroom:** **5**

[Filed Concurrently with Notice of Motions; Declarations in Support of Motions; and Proposed Preliminary Approval Order]

## Table of Contents

**Page**

Introduction ..... 1
The "Polaris Group" Junk Faxes ..... 3
The Litigation ..... 3
The Road to Settlement ..... 6
The Proposed Class Action Settlement Agreement ..... 9
Argument ..... 12
I. This Settlement Easily Satisfies the Standards for Preliminary Approval ..... 12
A. The Guidelines for Preliminary Approval of Class Settlements ..... 12
B. The Standards Support Preliminary Approval of the Proposed Settlement ..... 14
1. The proposed settlement is the product of serious, informed, and non-collusive negotiations ..... 14
2. The settlement has no obvious deficiencies ..... 15
3. The settlement treats all class members fairly ..... 18
4. The settlement is within the range of possible approval ..... 18
a. Cannon & Associates ..... 20
b. RehabCare Group ..... 22
II. Certification of the Proposed Settlement Class Is Fully Warranted ..... 26
A. This Case Satisfies All Rule 23(a) Prerequisites for Class Certification ..... 27
1. The class is numerous ..... 27
2. There are common issues affecting all class members ..... 27
3. Glenoaks' claims are typical of those held by the class ..... 27
4. Glenoaks and Its Counsel Will Fairly and Adequately Protect the Class ..... 28
B. The Proposed Class May Be Maintained Under Rule 23(b)(3) ..... 29
1. Common questions predominate this case ..... 29
2. A class action is the superior method of adjudication ..... 31
III. The Proposed Manner and Content of Class Notice Are Appropriate and Adequate ..... 32

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

**Table of Contents**
**(continued)**

**Page**

Conclusion ........................................................ 34

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

## Table of Authorities

Page(s)

**Cases**

*A & L Indus., Inc. v. P. Cipollini, Inc.*,
No. 12-07598 (SRC), 2013 WL 5503303 (D.N.J. Oct. 2, 2013) ........ 30

*Aguilar v. Wawona Frozen Foods*,
No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789 (E.D. Cal. Jan. 11, 2017) ........ 13, 26, 27

*Air Line Stewards, etc., Local 550 v. American Airlines, Inc.*,
455 F.2d 101 (7th Cir. 1972) ........ 13

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 32

*American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*,
757 F.3d 540 (6th Cir. 2014) ........ 9, 18

*American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*,
No. 1:09-cv-1162, 2013 WL 3654550 (W.D. Mich. July 12, 2013), *aff'd*,
757 F.3d 540 (6th Cir. 2014) ........ 31

*American Pipe and Constr. Co. v. Utah*,
414 U.S. 538 (1974) ........ 24, 25

*Americana Art China Co., Inc. v. FoxFire Printing and Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014) ........ 19

*APB Assocs., Inc. v. Bronco's Saloon, Inc.*,
315 F.R.D. 200 (E.D. Mich. 2016) ........ 18

*Bais Yaakov of Spring Valley v. FCC*,
No. 14-1234 (D.C. Cir.) ........ 20

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ........ 26

*Boyd v. Bechtel Corp.*,
485 F. Supp. 610 (N.D. Cal. 1979) ........ 25

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016) ........ 23

*Catholic Soc. Servs., Inc. v. INS*,
232 F.3d 1139 (9th Cir. 2000) (*en banc*) ........ 24

**Table of Authorities**
**(continued)**

**Page(s)**


*Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*,
No. 8:13-CV-01592-AEP, 2014 WL 7224943 (M.D. Fla. Dec. 17, 2014) ........................ 22

*City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*,
No. CV 13-4595 (NLH/JS), 2015 WL 5769951 (D.N.J. Sept. 29, 2015) .......................... 22

*City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*,
296 F.R.D. 299 (D.N.J. 2013)........................................................................................... 31

*Emmons v. Quest Diagnostics Clinical Labs., Inc.*,
No. 1:13-cv-00474-DAD-BAM, 2016 WL 3418452 (E.D. Cal. June 22, 2016) ............................................................................................................ *passim*

*Emmons v. Quest Diagnostics Clinical Labs., Inc.*,
No. 1:13-CV-00474-DAD-BAM, 2017 WL 749018 (E.D. Cal. Feb. 27, 2017) ................................................................................................................... 16

*Fauley v. Metropolitan Life Ins. Co.*,
No. 14.................................................................................................................................. 19

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
No. 07 C 5953, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009)............................................... 9

*Garnett v. ADT, LLC*,
No. 2:14-02851 WBS AC, 2016 WL 1572954 (E.D. Cal. Apr. 19, 2016) (Shubb, J.) ......................................................................................................... 13

*Gerardo v. Quong Hop & Co.*,
No. C 08-3953 JF (PVT), 2009 WL 1974483 (N.D. Cal. July 7, 2009) ............................ 25

*Glass v. UBS Fin. Servs., Inc.*,
No. C-06-4068, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007)............................................ 26

*Great Plains Trust Co. v. Union Pac. R. Co.*,
492 F.3d 986 (8th Cir. 2007) .............................................................................................. 24

*Gribble v. Cool Transps. Inc.*,
No. CV 06-04863, 2008 WL 5281665 (C.D. Cal. Dec. 15, 2008) .................................... 25

*Griffin v. Singletary*,
17 F.3d 356 (11th Cir. 1994) .............................................................................................. 25

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................................................ 27


PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

**Table of Authorities**
**(continued)**

**Page(s)**


*Hawk Valley, Inc. v. Taylor*,
301 F.R.D. 169 (E.D. Pa. 2014) ........ 31

*Hinman v. M and M Rental Ctr., Inc.*,
545 F. Supp. 2d 802 (N.D. Ill. 2008) ........ 32

*Imhoff Inv., L.L.C. v. Alfoccino, Inc.*,
792 F.3d 627 (6th Cir. 2015) ........ 18, 30

*Ira Holtzman, CPA, & Assocs., Ltd. v. Turza*,
728 F.3d 682 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1318 (2014) ........ 30

*Johnson v. Quantum Learning Network, Inc.*,
No. 15-CV-05013-LHK, 2017 WL 747462 (N.D. Cal. Feb. 27, 2017) ........ 21

*Jordan v. Los Angeles County*,
669 F.2d 1311 (9th Cir. 1982), *vacated on other grounds*, *County of Los Angeles v. Jordan*, 459 U.S. 810 (1982) ........ 27

*Kmiec v. Powerwave Techs., Inc.*,
No. SACV1200222CJCJPRX, 2016 WL 5938709 (C.D. Cal. July 11, 2016) ........ 21

*Lehto v. Allstate Ins. Co.*,
31 Cal. App. 4th 60 (1994) ........ 21

*Local Joint Exec. Bd. v. Las Vegas Sands, Inc.*,
244 F.3d 1152 (9th Cir. 2001) ........ 29

*In re Mego Fin. Corp. Secs. Litig.*,
213 F.3d 454 (9th Cir. 2000) ........ 28

*Morales v. Conopco, Inc.*,
No. 2:13-2213 WBS EFB, 2016 WL 3688407 (E.D. Cal. July 12, 2016) (Shubb, J.) ........ 17

*Murillo v. Pacific Gas & Elec. Co.*,
266 F.R.D. 468 (E.D. Cal. 2010) ........ 17

*Mussat v. Global Healthcare Resource, LLC*,
No. 11 C 7035, 2013 WL 1087551 (N.D. Ill. Mar. 13, 2013) ........ 32

*Officers for Justice v. Civil Serv. Comm'n*,
688 F.2d 615 (9th Cir. 1982) ........ 12, 13


PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

**Table of Authorities**
**(continued)**

**Page(s)**

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
781 F.3d 1245 (11th Cir. 2015) .......... 22

*Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*,
311 F.R.D. 688 (S.D. Fla. 2015).......... 18

*Redman v. RadioShack Corp.*,
768 F.3d 622 (7th Cir. 2014) .......... 21

*Rossi v. Whirlpool Corp.*,
No. 2:12-CV-00125-TLN-CKD, 2016 WL 3519306 (E.D. Cal. June 28, 2016) (Nunley, J.) .......... 17

*Roylance v. ALG Real Estate Servs.*,
No. 5:14-cv-02445-PSG, 2015 WL 1522244 (N.D. Cal. Mar. 16, 2015) .......... 23

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) .......... 9

*Savanna Group, Inc. v. Trynex, Inc.*,
No. 10-cv-7995, 2013 WL 66181 (N.D. Ill. Jan 4, 2013) .......... 18

*Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*,
642 F.3d 560 (7th Cir. 2011) .......... 24

*In re Seagate Techs. Sec. Litig.*,
115 F.R.D. 264 (N.D. Cal. 1987).......... 28

*Shell Oil Co. v. National Union Fire Ins. Co.*,
44 Cal. App. 4th 1633 (1996) .......... 21

*Silber v. Mabon*,
18 F.3d 1449 (9th Cir. 1994) .......... 32

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .......... 12, 19, 26

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) .......... 12

*Taylor v. Fedex Freight, Inc.*,
No. 1:13-CV-01137-DAD-BAM, 2016 WL 1588405 (E.D. Cal. Apr. 20, 2016) .......... 13, 16

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

**Table of Authorities**
**(continued)**

**Page(s)**

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ....... 29

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993) ....... 21

*Vasquez v. Coast Valley Roofing, Inc.*,
670 F. Supp. 2d 1114 (E.D. Cal. 2009) ....... 26

*Weinberger v. Jackson*,
102 F.R.D. 839 (N.D. Cal. 1984) ....... 28

**Other Authorities**

47 C.F.R. 64.1200 ....... 4, 20, 22, 30

28 U.S.C. § 1568 ....... 24

47 U.S.C. § 227 ....... 3, 4

FED. R. CIV. P. 23 ....... passim

Local Rule 251(b) ....... 14

In re DISH Network, LLC,
28 F.C.C. Rcd. 6574 (2013) ....... 23

In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,
18 F.C.C. Rcd. 14014 (2003) ....... 20

Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,
29 F.C.C. Rcd. 13998 (2014) ....... 20

In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,
CG Docket Nos. 02-278, 05-338, FCC 14-164, Order, ¶ 27 n.99 (Oct. 30, 2014) ....... 20

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

## Introduction

Late last year, following an intense, two-day mediation, the parties reached a class-wide settlement of this TCPA litigation. In the settlement, Defendants RehabCare Group, Inc., and Cannon & Associates LLC will pay $25 million—one of the largest TCPA recoveries ever—to recipients of "Polaris Group" fax advertisements. The settlement does not require class members to submit a claim, but instead automatically distributes proceeds to members at addresses recorded in Defendants' business records. Under no circumstances will any settlement funds revert to Defendants.

If approved by this Court, the settlement will succeed where prior attempts have failed. In two earlier lawsuits, one in Illinois and the other in Florida, long-term care facilities brought TCPA claims based on the same "Polaris Group" junk fax campaigns and sought class treatment for all fax recipients. But both cases eventually settled on an individual basis, without recovery for any fax recipients beyond the two named plaintiffs.

Plaintiff Dakota Medical, Inc., dba Glenoaks Convalescent Hospital, now asks the Court to enter an order preliminarily approving the settlement (including its notice plan); preliminarily certifying the settlement class; appointing Glenoaks as class representative, Glenoaks' attorneys as class counsel, and Kurtzman Carson Consultants LLC as the settlement administrator; and setting a schedule for the settlement process, including the final approval hearing. Glenoaks respectfully submits that the proposed settlement, settlement class, and notice plan satisfy Rule 23:

- The settlement satisfies all Ninth Circuit criteria for preliminary class settlement approval. This case has been tenaciously fought throughout its two-year lifetime. The settlement was the product of intense, arms-length negotiations overseen by an experienced mediator. Class members will receive substantial monetary benefits without having to file

claims. The proposed release is narrowly tailored to the claims made in this case. Most importantly, the benefits guaranteed by settlement avoid years of future litigation and a significant risk that the class would ultimately recover nothing.

- The proposed settlement class consists of subscribers of facsimile telephone numbers to which there was a successful transmission of one or more facsimiles by Defendants (or either of them) between July 17, 2010, and February 4, 2014, in broadcasts by WestFax Inc., a third-party fax broadcaster. Records produced in discovery identify the number of successful transmissions and the specific fax telephone numbers to which the faxes were sent. The class easily meets all Rule 23(a) prerequisites for maintenance of a class action—the class is numerous, consisting of almost 13,000 members; Glenoaks' claims are typical because Glenoaks and the class sustained the same TCPA violations and are entitled to the same relief; Glenoaks and its attorneys have protected the class; and Glenoaks has no interests antagonistic to the class. The class qualifies for class treatment under Rule 23(b)(3) because common questions of law and fact predominate and a class action is by far the most superior method of litigating this controversy.

- The settlement proposes a plan that ensures effective notice to class members and meets Rule 23(e)'s requirements and due process. Transmission records identify all fax telephone numbers to which the faxes were sent. The parties have collaborated to identify names and addresses for over 93 percent of the proposed class. Class members will learn about all key settlement terms in a plain English short-form notice. The notice will be sent by facsimile to the same telephone numbers to which the ads were sent and, if transmission is unsuccessful, the notice will be mailed to the addresses on file with Defendants (and updated by the settlement administrator). The settlement also establishes a settlement website where class members can obtain additional information.

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

**The "Polaris Group" Junk Faxes**

Glenoaks Convalescent Hospital is a 99-bed skilled nursing facility in Glendale, California. (LeVine Decl. ¶ 2.) The hospital has become a target of junk fax advertisers seeking to peddle their products to the long-term care industry. In a span of about three years, Glenoaks received 241 fax advertisements hawking products and services offered by "Polaris Group." (ECF No. 158-16, p. 4 (Biggerstaff Dep. 239:7-23).) The ads promoted a wide variety of product offerings, including care manuals and CDs, Medicare reimbursement services, audit compliance consulting, and workshops and seminars on healthcare industry topics. Some advertisements promoted care manuals that were "Developed by RehabCare Group." (*See* ECF No. 1, Ex. 5; Porter Decl. Ex. E.)

Glenoaks had never asked for any "Polaris Group" junk faxes, nor had it agreed to receive them. (LeVine Decl. ¶ 5.) To the contrary, the faxes disrupted the hospital's operations, wasted valuable personnel time, tied up its fax machine (often used to fill patient prescriptions), and consumed its paper and toner. (*Id.*)

**The Litigation**

In late 2014 Glenoaks commenced litigation against Cannon & Associates LLC, the corporate entity behind the "Polaris Group" name, and RehabCare Group, Inc., Cannon's former indirect parent company.[1] Glenoaks charged Cannon and RehabCare with violating the Telephone Consumer Protection Act, 47 U.S.C. § 227, and related Federal Communications Commission regulations. (ECF No. 1, *passim*.) The act makes it illegal to send unsolicited

---

[1] Glenoaks was originally joined by R. Fellen, Inc., which does business as Sunnyside Convalescent Hospital in Fresno. Last year, however, Sunnyside dismissed its claims without prejudice and withdrew as a named plaintiff. (*See* ECF No. 138.)

facsimile advertisements within the United States. 47 U.S.C. § 227(a)(6), (b)(1).[2] The FCC has issued implementing regulations that require an advertiser to disclose to recipients that they have a right to stop future junk faxes—whether the fax is solicited *or* unsolicited. *See* 47 C.F.R. § 64.1200(a)(4)(iii), (iv). The act authorizes recipients to bring a private action for damages, including a minimum statutory damage of $500 per violation. Damages may be increased up to three times for a knowing or willful violation. *See* §§ 227(b)(1)(C), (b)(3).

In this case, Glenoaks contends that Defendants violated the TCPA in two independent ways: first by sending unsolicited facsimile advertisements and, second, by sending fax advertisements that failed to contain the mandatory notice of a recipient's right to stop future junk faxes. (*See* ECF No. 1, ¶ 30.) Glenoaks brought the case as a putative class action on behalf of all subscribers of telephone numbers "to which material that discusses, describes, or promotes the property, goods, or services of Defendants (or either of them) was sent via facsimile transmission between July 1, 2010, and February 4, 2014…" (*Id.* ¶ 21.)

Defendants assembled formidable legal teams to defend their interests. RehabCare retained as lead counsel highly experienced defense attorneys with the respected Miami law firm, Broad and Cassel, and bolstered the team with retired judge Oliver W. Wanger. Cannon retained Gordon, Rees, a well-respected litigation specialty firm based in San Francisco, which formed a defense team composed of several veteran business litigators.

Discovery confirmed a massive, systematic "Polaris Group" fax advertising program. Over the course of three and one-half years, Cannon successfully broadcast fully 2,149 "Polaris Group" advertisements to over 2.4 million fax telephone numbers nationwide, primarily numbers belonging to skilled nursing facilities that were its target customers. (ECF

---

[2] Unless otherwise indicated, all statutory references are to the TCPA, codified at 47 U.S.C. § 227.

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

No. 146 (Biggerstaff Decl.), ¶ 16; Cordero Decl. Ex. B (Cave Dep. I) 50:18-51:1; 114:17-115:2.) A small number of the fax-blasts, primarily dating from 2010 and 2011, promoted manuals "developed by RehabCare Group." (Porter Decl. ¶¶ 2-6, Ex. E.) At that time, Cannon was an indirect subsidiary of Defendant RehabCare Group, Inc., a large rehabilitation services provider and operator of rehabilitation hospitals.[3]

The advertising copies were prepared by Cannon at its Tampa, Florida, offices. Once the ad copy was finalized, a Cannon employee would upload the ad to WestFax, a Denver-based fax broadcaster, and specify the list of fax telephone numbers to which the fax would be broadcast. (Cannon had prepared the lists from a master skilled nursing facility database published by Billian. (*See* Cordero Decl. Ex. B (Cave Dep. I 35:10-38:4, 41:6-22).) WestFax would then execute the blast and provide a report to Cannon detailing the number of successful fax transmissions and the specific fax telephone numbers to which transmission had failed. (*See* ECF No. 149-9 (Clark Decl.), ¶ 8; Cordero Decl. Ex. B (Cave Dep. II 291:4-6).)

Not surprisingly, given the stakes and the caliber of the two defense teams, RehabCare and Cannon have tenaciously defended the claims. Both Defendants insist that no TCPA violations occurred because Cannon had permission to send the faxes through a wide variety of means, including alleged agreements by all members of some 70+ long-term care industry trade associations. (*See* ECF No. 148-3 (Brown Decl., Ex. E), pp. 5-11.) The Defendants also contend that the faxes provided adequate information to recipients about how recipients could stop future fax advertisements, and that the faxes therefore complied with the law's opt-out notice requirements. (*See* ECF No. 21 (Cannon Answer), p. 10; ECF No. 10 (RehabCare

---

[3] RehabCare Group acquired Cannon in 2006. (*See* ECF No. 162-1, ¶ 15.) After the acquisition, RehabCare was the parent corporation of RehabCare Group East, Inc., which was the sole member of Symphony Health Services, LLC, which was the sole member of Cannon & Associates LLC. (*Id.* ¶ 16.) In 2014, however, RehabCare sold Cannon to Charles Cave, the company's former chief operating officer. (*See id.* ¶ 17.) Cannon now operates as an independent company. (*Id.* ¶ 18.)

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

Answer), p. 7.)

RehabCare, however, vigorously disputes liability for the fax ads under *any* circumstances, even if the faxes were unsolicited. First, RehabCare denied that it had any involvement in the fax advertising campaigns. RehabCare pointed out that Cannon employees created the ad content, purchased the fax telephone numbers, compiled the lists of numbers to which faxes were to be sent, and sent the faxes through Westfax. (ECF No. 162, pp. 9-10.) Second, RehabCare contended that none of the faxes promoted its goods or services. The company asserted that only a handful of faxes sent to Glenoaks mentioned its name, the so-called "Manual Faxes." Although the manuals "were written by RehabCare, RehabCare never sold or offered for sale these manuals or any other manuals," which "were sold only by [Cannon]." (*Id.*, p. 8.) Finally, RehabCare denied that it was liable on agency or other vicarious liability theories. RehabCare insisted that it had not directed either Cannon or WestFax to send the faxes (*id.*, p. 16), nor had it controlled the manner or means of the fax-blast program. (*Id.*, p. 21.)

**The Road to Settlement**

Early in the case Defendants expressed interest in exploring settlement. In a June 2015 meeting at the Wanger Jones Helsey offices, lead RehabCare attorney Jon Wilson said that his client was interested in mediation. (Fischbach Decl. ¶ 7.) Glenoaks' attorneys responded positively to Wilson's suggestion, but stressed that they needed to obtain basic discovery concerning the various defenses in order to have an informed assessment of the case. (*Id.*) The parties agreed this was a reasonable approach and to schedule mediation following basic discovery. (*Id.*)

From the standpoint of Glenoaks and its attorneys, a major concern was the practical ability to collect any class-wide judgment that might be obtained against Cannon, the party at

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

the center of the fax program. Although at one time Cannon was an indirect RehabCare subsidiary, by the time the lawsuit began Cannon had been spun off in a sale to Charles Cave, its longtime chief operating officer. (Cave Decl. ¶¶ 1-2; *see also* n.3, *supra*.) The company appeared to have modest revenues and even more limited assets to satisfy any damages award. (Cave Decl. ¶¶ 2-7.) Glenoaks' attorneys therefore pursued discovery of liability insurance policies that might conceivably cover the claims in this case. Discovery turned up two policies written by Homeland Insurance Company of New York—a $1 million general liability policy and a $7 million excess policy above the primary. (Cordero Decl. ¶ 10.) The policies protected RehabCare and Cannon against liability for claims arising out of "general liability" occurrences taking place between May 1, 2010, and May 1, 2011. (*Id.*)

In May 2016 the parties proceeded to mediation with retired San Francisco Superior Court judge William J. Cahill. (Fischbach Decl. ¶ 8.) Without disclosing specific mediation communications, the parties strongly disagreed whether a settlement should be a claims-made structure, with all unclaimed funds reverting to Defendants, or whether a common fund should be made available for distribution to all class members. (*Id.*) After several hours, the meeting ended without any prospect of settlement and the parties resumed active litigation. (Cordero Decl. ¶ 12.)

A few weeks later, in July 2016, Glenoaks' attorneys had discussions with Cannon's attorney about a potential bilateral settlement with Cannon, to the limits of the two Homeland policies. (Cordero Decl. ¶ 13.) In late September, Cannon's attorney responded that Homeland would not entertain a bilateral settlement without RehabCare's consent. (*Id.*) At the same time, the Cannon lawyer said that their discussions had opened the door to a further mediation, and that RehabCare had expressed similar interest. (*Id.*)

The parties eventually agreed to a second mediation, this time with John Bickerman, a nationally-recognized mediator. (Cordero Decl. ¶ 14.) At the time, two important motions

were pending before the Court. In early October, Glenoaks had moved to certify a class of all subscribers of fax telephone numbers to whom the faxes were sent. (ECF No. 145.) And a few weeks later, RehabCare moved for summary judgment on all claims by Glenoaks (ECF No. 157-3), on the theory that RehabCare was neither directly nor vicariously liable under the TCPA for the "Polaris Group" fax advertising program. (ECF No. 162, *passim*.) Both motions were set for hearing on December 20, 2016.

Mediation took place in mid-November at the offices of Gordon & Rees in Washington, D.C. In attendance were several RehabCare attorneys, a Cannon attorney, an attorney representing Homeland, and Glenoaks' legal team. (Cordero Decl. ¶ 15; Magolnick Decl. ¶ 9.) Over the course of two days the parties negotiated all material terms of a class-wide settlement. (Cordero Decl. ¶ 16.) The first day was dominated by intense negotiations over the amount and structure of settlement (claims-made or common fund). (*Id.*) On the second day, the parties finally resolved those issues and began drafting a detailed term sheet to memorialize a deal, which they continued to hammer out in the following days. (*Id.* ¶¶ 16-17.)

In the final term sheet, the parties agreed to establish a settlement class consisting of subscribers of all facsimile telephone numbers to which there was a successful transmission of faxes by Defendants between July 17, 2010, and February 4, 2014, in broadcasts by WestFax. (ECF No. 169-1, ¶ 1.) Defendants agreed to establish a $25 million common fund for the benefit of the settlement class. (*Id.* ¶ 3.) Settlement funds would be distributed automatically to all class members that could be identified, without the need for a formal claims process. (*Id.* ¶ 8.) And under no circumstances would any portion of the settlement proceeds revert to Defendants. (*Id.* ¶ 13.)

Although the term sheet was binding, it contemplated a comprehensive agreement to address settlement administration issues and other details associated with a class settlement. (ECF No. 169-1, p. 2, ¶ 20.) This turned out to be a long and difficult process. RehabCare



PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

demanded several new terms in the agreement, including a dramatic expansion of the class release. (Cordero Decl. ¶ 20.) Glenoaks and its legal team rejected the demands because they believed RehabCare's proposed terms were unwarranted and inconsistent with the binding term sheet. (*Id.* ¶ 21.) Over the ensuing months, the parties exchanged no fewer than eleven drafts of the Class Action Settlement Agreement. (*Id.* ¶ 22.) Eventually, with the able assistance of the mediator, the parties were able to overcome these obstacles. (*Id.*)

**The Proposed Class Action Settlement Agreement**

Last week the parties completed lengthy and difficult negotiations over the comprehensive Class Action Settlement Agreement. (The agreement and exhibits were lodged March 20, 2017, as ECF No. 171.) The key terms are summarized below.

***The Proposed Settlement Class***. A proposed settlement class will be established, consisting of all persons that were subscribers of facsimile telephone numbers to which there was a successful transmission of one or more facsimiles by Defendants (or either of them) between July 17, 2010, and February 4, 2014, in broadcasts by WestFax Inc. (ECF No. 171 (CASA) ¶ 1, 10.A.) Defendants and their affiliates are expressly excluded from the class. (*Id.*) The settlement class can be objectively identified from transmission records generated by WestFax.[4] The transmission records identify—for each fax sent—the job number, date/time, fax telephone number, and whether the fax transmission was successful. (*See, e.g.*, ECF No. 146 (Biggerstaff Decl.) ¶¶ 11-13, 16.) Since the settlement, the parties have worked together to identify 12,824 class members. (Nemec Decl. ¶ 11; Campagne Decl. ¶¶ 2-9.)

---

[4] Numerous decisions have found transmission records to be reliable and admissible to identify the class. *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 997 (8th Cir. 2016); *American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009).



PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

***Payments to the Class***. Defendants will establish a $25 million settlement fund, without the possibility of reversion. (ECF No. 171 (CASA) ¶¶ 3.A-C, 11.A-B.) Class members do not need to submit claims or prove that they received any faxes. Instead, all net settlement proceeds will be *automatically* distributed to class members at addresses contained in a "Master Facsimile Transmission Database," a compendium of all class members and their telephone numbers derived from Cannon's business records. (*Id.* ¶¶ 3.A-C, 6, 11.A-B.)[5] Each class member will be paid for each successful fax transmission to the member's telephone number. (*Id.* ¶ 3.C.)

***Class Member Releases***. Class members who do not opt out will release Defendants and related parties when the settlement becomes final. (ECF No. 171 (CASA) ¶ 12.) The release is limited to claims based on the transmission of the faxes and/or this action. (*Id.*)

***Settlement Administration***. The settlement will be administered by Kurtzman Carson Consultants, LLC, a leading class action settlement administrator. (ECF No. 171 (CASA) ¶ 4.A.) KCC has administered thousands of class settlements nationwide, including several in this district. (Carameros Decl. ¶¶ 5-7.) KCC will be responsible for sending the class notice, processing changes of address, establishing and maintaining the settlement website, delivering regular status reports to the parties, and eventually, distributing settlement funds to the class.

***The Notice Plan***. The settlement contemplates a robust notice program. The settlement administrator will send all class members a plain-English notice. The notice informs members of the nature and status of the case, the key terms of settlement, the benefits available to class members, how the settlement would affect their legal rights (including

---

[5] For several months after mediation, the parties worked diligently to match fax telephone numbers of recipients with companies in Cannon's business records. (Nemec Decl. ¶¶ 6-11); Campagne Decl. ¶¶ 2-9.) They successfully matched names and addresses to fully 12,075 fax telephone numbers, over 93 percent of the class. (Nemec Decl. ¶ 10; Campagne Decl. ¶ 8.)

releases of Defendants), and important settlement deadlines. (ECF No. 171 (CASA) Ex. 1.) The notice also informs the class that class counsel will move for an award of attorneys' fees and expenses in an amount up to one third of the settlement fund and that Glenoaks will move for an incentive award. (*Id.*) The notice informs members how they can opt out of the class and object to settlement, the motion for attorneys' fees, or the motion for incentive award. (*Id.*)

The notice also informs class members how to contact the settlement administrator and access the settlement website (www.rehabcaresettlement.com), at which members can obtain additional information. The website will provide links through which members can download a "long-form" notice (containing detailed information about the settlement and options available to members), the complaint, the settlement agreement, the motion for preliminary approval, the Court's order on this motion, and other key case documents. (ECF No. 171 (CASA) ¶ 8, Ex. 4.)

The notice will include a Class Member Information Form (ECF No. 171, Ex. 2). Although the vast majority of the class need not complete the form in order to receive payment,[6] the form permits class members to provide updated names and addresses for purposes of receiving payment. (*See id.*)

***Class Representative Service Award***. The settlement agreement permits Glenoaks to seek, subject to Court approval, an award for service as class representative. (ECF No. 171, ¶ 5.C.) Any service award will be paid from the settlement fund. There is no "clear-sailing" provision. (*Id.*)

---

[6] For the small percentage of fax telephone numbers the parties were unable to match to a business name and address (901), the administrator will send a customized Class Member Information Form. (*See* ECF No. 171, Ex. 3.) This form tells recipients they will need to complete and return the form in order to receive a settlement payment.

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

***Class Counsel's Attorneys' Fees and Costs***. The settlement acknowledges that Class Counsel will move for an award of attorneys' fees and costs from the settlement fund. (ECF No. 171, ¶ 5.A.) Again, there is no "clear-sailing" provision. (*Id.*)

**Settlement Termination Option.** Defendants have the right to terminate the settlement if class members to whom more than 4,000 fax transmissions were sent opt-out of the class. (ECF No. 171, ¶ 10.B.) If class members representing more than 2,000 but fewer than 4,000 transmissions opt out, up to $1 million will be withheld from the settlement to indemnify Defendants against individual claims within this band. All escrowed funds not used to pay individual claims within one year will be distributed to the class.

## Argument

### I. This Settlement Easily Satisfies the Standards for Preliminary Approval

#### A. The Guidelines for Preliminary Approval of Class Settlements

Rule 23(e) requires judicial approval for the compromise of claims brought on a class basis. The Ninth Circuit has repeatedly stressed that "voluntary conciliation and settlement are the preferred means of dispute resolution." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008). "This is especially true in complex class action litigation..." *Id.* (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)); *see also Staton v. Boeing Co.*, 327 F.3d 938, 951-952 (9th Cir. 2003).

Courts consider several factors to approve a class settlement. *Officers for Justice*, 688 F.2d at 625. The non-exhaustive list includes (1) the strength of Plaintiffs' case; (2) the risk, expense, complexity and duration of further litigation; (3) the risk of maintaining class certification; (4) the amount of the settlement; (5) investigation and discovery; (6) the

experience and views of counsel; and (7) the reaction of the class members to the proposed settlement. *Id.*[7] Many of these factors, however, cannot be assessed at the preliminary approval stage. *Garnett v. ADT, LLC*, No. 2:14-02851 WBS AC, 2016 WL 1572954, at *6 (E.D. Cal. Apr. 19, 2016) (Shubb, J.). Instead, "the court need only conduct a preliminary review at this time to resolve any 'glaring deficiencies' in the settlement agreement before authorizing notice to class members." *Id.* (citations omitted).

Most courts in this district, including this Court, preliminarily approve a settlement and notice plan "[i]f [1] the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls with[in] the range of possible approval." *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *3 (E.D. Cal. Jan. 11, 2017) (Drozd, J.) (quoting *In re Tableware Antitrust Litig*., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)); *Taylor v. Fedex Freight, Inc.*, No. 1:13-CV-01137-DAD-BAM, 2016 WL 1588405, at *4 (E.D. Cal. Apr. 20, 2016) (Drozd, J.). This settlement satisfies all four requirements.

---

[7] Fairness determinations must take into account that settlement is a compromise; it is not necessary or required for a settlement to obtain the exact recovery that could be had at trial. *Officers for Justice*, 688 F.2d at 624-25. As the Ninth Circuit has stressed, "The very essence of settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (citation omitted). Even if "the relief afforded by the proposed settlement is substantially narrower than it would be if the suits were to be successfully litigated," it is no bar to a class settlement because "the public interest may indeed be served by a voluntary settlement in which each side gives ground in the interest of avoiding litigation." *Air Line Stewards, etc., Local 550 v. American Airlines, Inc.*, 455 F.2d 101, 109 (7th Cir. 1972).



PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

### B. The Standards Support Preliminary Approval of the Proposed Settlement

#### 1. The proposed settlement is the product of serious, informed, and non-collusive negotiations

This settlement was not achieved until after two years of hard-fought litigation. (Cordero Decl. ¶ 5.) Although RehabCare had suggested mediation early on, Glenoaks and its legal team stressed the need to obtain basic discovery before discussing potential resolution. (Fischbach Decl. ¶ 7.) Glenoaks proceeded to obtain tens of thousands of documents, take several depositions, and work with key experts. (Cordero Decl. ¶ 5.) To overcome Defendants' objections to much of this discovery, Glenoaks' legal team had numerous Local Rule 251(b) meetings with defense counsel and filed several motions to compel discovery. (Brown Decl. ¶¶ 6-12.) The discovery obtained enabled Glenoaks' legal team to make an informed evaluation of the strength of the claims and the viability of key defenses.

Settlement did not come easy or early. The first mediation, an all-day affair with a respected former San Francisco Superior Court judge, failed with little prospect for resolution. (Fischbach Decl. ¶ 8.) Afterward Glenoaks' attorneys explored a potential bilateral settlement with Cannon alone, but Defendants' common insurer made clear that it would require a universal settlement. (Cordero Decl. ¶ 13.)

By the time of the second mediation, the parties were engaged in active litigation. As noted earlier, Glenoaks moved in early October for certification of a class of all junk fax recipients, and RehabCare moved later that month for summary judgment on all Glenoaks claims. At mediation, with both motions pending, the parties negotiated strenuously over financial and other key terms. On the second day, the parties began negotiations over a lengthy term sheet, line by line, which continued in the days following mediation. (Cordero

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

Decl. ¶ 16.) One week later the parties executed the final term sheet. (*Id.* ¶ 18.)

Even after the term sheet, the parties had sharp differences over the terms of a formal settlement agreement. (Cordero Decl. ¶¶ 19-21.) In the process of preparing the formal settlement agreement, RehabCare demanded terms that Glenoaks' attorneys believed were extrinsic to or inconsistent with the binding term sheet. (*Id.* ¶ 20.) Breaking through this logjam required numerous settlement drafts, several emails and other communications, and active participation by the mediator. (*Id.* ¶¶ 21, 22.) Only last week, after months of difficult negotiation, were the parties able to agree on final terms of the Class Action Settlement Agreement and ancillary documents, and the terms of the proposed preliminary and final approval orders. (*Id.* ¶ 22.)

**2. The settlement has no obvious deficiencies**

The settlement easily surmounts the low bar of "no obvious deficiencies." The $25 million settlement—believed to be the third largest TCPA junk fax settlement ever[8]—provides substantial financial benefits to the class. And unlike the vast majority of TCPA and other consumer class cases, all identifiable class members will be paid *automatically* without having to complete a detailed claim form. The allocation formula logically distributes proceeds among the class based on the number of faxes received by each class member. (ECF No. 171, ¶ 3.B.)[9]

---

[8] Measured by the amount actually *received by the class*, however, this recovery would be the second largest ever. A 2015 settlement in the Stericycle junk fax litigation resulted in a gross $28.2 million payment, of which $13 million was paid to the class on a claims-made basis, and $15.2 million was paid for attorneys' fees and expenses and incentive awards. (*See* Cordero Decl. n.4.) Interline Brands, a $40 million non-reversionary settlement, is the largest known junk fax recovery under the TCPA. (*Id.* ¶ 37.a.)

[9] Each class member will be awarded one share for each transmission, and is entitled (footnote continued)

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

No portion of the settlement proceeds will revert to the Defendants. (ECF No. 171, ¶ 11.B.) The settlement expressly adopts the redistribution principles set forth in section 3.07 of the Law of Aggregate Litigation (American Law Institute 2010). Any unclaimed funds will be redistributed to all class members that negotiated settlement checks. (*Id.*) Only if a further class redistribution is not economically viable will excess funds be distributed to a *cy pres* recipient whose interests approximate those being pursued by the class. (*Id.*)

The release to be provided by class members is narrowly tailored and limited to claims "based on the transmission" of the faxes and claims made in the case. (ECF No. 171, ¶ 12.) Class members will not release any unrelated claims. (*Id.*; *see also* Cordero Decl. ¶ 21.) The released claims "appropriately track the breadth of plaintiffs' allegations in this action and the settlement does not release unrelated claims that class members may have against defendants." *Emmons v. Quest Diagnostics Clinical Labs., Inc.*, No. 1:13-cv-00474-DAD-BAM, 2016 WL 3418452, at *8 (E.D. Cal. June 22, 2016) (Drozd, J.).

The settlement permits class counsel to seek payment of attorneys' fees from the common fund. (ECF No. 171, ¶ 5.A.) There is no "clear sailing" clause (*id.*), and the parties did not negotiate fees. (Cordero Decl. ¶ 16 & n.2.) Plaintiffs' counsel will request no more than one-third of the common fund, which is within the typical range considered in the Ninth Circuit. As this Court has noted, 20 to 33 1/3 percent are acceptable fees, while "[p]ercentage awards between twenty and thirty percent are common." *Emmons*, 2016 WL 3418452, at *6; *Taylor*, 2016 WL 1588405, at *5; *see also Emmons v. Quest Diagnostics Clinical Labs., Inc.*, No. 1:13-CV-00474-DAD-BAM, 2017 WL 749018, at *8 (E.D. Cal. Feb. 27, 2017) (Drozd, J.) (ordering payment of one-third to class counsel).

---

to a percentage of the settlement fund determined by dividing the member's shares by the number of shares awarded to all eligible class members. (ECF No. 171, 3.B.)

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

Class counsel will provide detailed basis for the requested fees in a Rule 23(h) motion. Because fees will be evaluated in the final approval process, courts preliminarily approve settlements with fee requests within the standard range. *See, e.g.*, *Emmons*, 2016 WL 3418452, at *6; *Murillo v. Pacific Gas & Elec. Co.*, 266 F.R.D. 468, 480 (E.D. Cal. 2010). Class members will receive notice of this request and will have the opportunity to object after class counsel file their fee motion. (ECF No. 171, ¶ 5.)

The settlement provides that Glenoaks may ask the Court to approve a service award from the settlement fund. (ECF No. 171, ¶ 5.C.) Such an award is "fairly typical" in class actions. *Emmons*, 2016 WL 3418452, at *6. Glenoaks understands that settlement is not contingent on any award, however. (LeVine Decl. ¶ 12.) Glenoaks anticipates moving for a $15,000 service award, which will be supported by argument and evidence submitted at the time.

Finally, the settlement appoints Kurtzman Carson Consultants, a widely-respected settlement administrator, to administer the settlement. (ECF No. 171 (CASA) ¶ 4.A.) KCC has been approved as administrator for class cases throughout the country, including this district. (Carameros Decl. ¶¶ 5-7.) *See, e.g.*, *Morales v. Conopco, Inc.*, No. 2:13-2213 WBS EFB, 2016 WL 3688407, at *10 (E.D. Cal. July 12, 2016) (Shubb, J.); *Rossi v. Whirlpool Corp.*, No. 2:12-CV-00125-TLN-CKD, 2016 WL 3519306, at *4 (E.D. Cal. June 28, 2016) (Nunley, J.). KCC has extensive experience administering TCPA settlements, in particular (Carameros Decl. ¶¶ 5-8 ), including the largest junk fax settlement on record, the *Interline Brands* matter. (Cordero Decl. ¶ 37.a.) KCC has budgeted settlement administration at just under $94,000. (*Id.* ¶ 25, Ex. C.) A significant percentage is dedicated to postage to send notices and checks to all class members. (*Id.*) These costs, amounting to about $7.30 per class member, are extremely reasonable.

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

### 3. The settlement treats all class members fairly

All class members are equally and fairly treated by this settlement. Net settlement funds will be distributed proportionally based on the number of successful transmissions to each class member. (ECF No. 171, ¶¶ 3.A-3.C.) Each member will receive the same amount per fax transmission. (*Id.*) Transmissions to each fax telephone number will be determined by Glenoaks' expert, Robert Biggerstaff, based on transmission records produced in discovery. (*Id.* ¶ 3.C.) Biggerstaff's analyses have been regularly accepted by courts nationwide as objective evidence of fax transmissions.[10]

### 4. The settlement is within the range of possible approval

Finally, the settlement falls within the range of possible approval, in comparison to potential outcomes of continued litigation. Comparing concrete settlement benefits with hypothetical litigation outcomes is an inexact science. "To determine whether a settlement 'falls within the range of possible approval' a court must focus on 'substantive fairness and adequacy' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.'" *Emmons*, 2016 WL 3418452, at *7 (quoting *In re Tableware*, 484 F. Supp. 2d at 1080.).

---

[10] Courts nationwide have held Robert Biggerstaff's expert testimony admissible to establish the number and characteristics of the defendant's junk fax transmissions. *See, e.g., Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 632-634 (6th Cir. 2015); *American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 544 (6th Cir. 2014); *APB Assocs., Inc. v. Bronco's Saloon, Inc.*, 315 F.R.D. 200, 207-208, 212 (E.D. Mich. 2016); *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 693-694 (S.D. Fla. 2015) (Biggerstaff report prepared for case satisfies ascertainability and administrative feasibility requirements needed for class certification); *Savanna Group, Inc. v. Trynex, Inc.*, No. 10-cv-7995, 2013 WL 66181, at *5-8 (N.D. Ill. Jan 4, 2013).

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

As discussed earlier, the settlement benefits to the class are substantial. The proposed settlement will pay $25 million to the class of fax ad recipients. (ECF No. 171, ¶ 3 A.) Class members will share its benefits without having to submit claims or prove they received any faxes. The gross settlement recovery averages about $1,950 per class member. And unlike the vast majority of TCPA class settlements, there is no possibility any settlement funds will revert to Defendants. (*Id.* ¶ 3 B.)[11] Because class members need not submit claims, Glenoaks and its attorneys anticipate that most, if not all, net settlement proceeds will be received by class members at addresses in Cannon's business records or found by the settlement administrator.

If the case hadn't settled, by contrast, the prospects for ultimate recovery were far from clear. For the class to receive anything, a favorable class certification decision was obviously necessary. (*See* ECF No. 145.) As the next section discusses (*see* pp. 26-32, *infra*), Glenoaks believes the case for certification is compelling, but "maintaining the class action was not a foregone conclusion." *Staton*, 327 F.3d at 962. Defendants vigorously opposed certification with numerous arguments lodged throughout almost 70 pages of briefing. (ECF Nos. 164, 165.) Glenoaks and its team were confident they would ultimately obtain certification, but there was some risk of an adverse decision.

Assuming the class would have been certified, it would have faced several obstacles to ultimately collecting damages. Each Defendant presented a unique set of challenges.

---

[11] Claims-made, reversionary settlements are commonplace in TCPA litigation. *See Americana Art China Co., Inc. v. FoxFire Printing and Packaging, Inc.*, 743 F.3d 243, 245 (7th Cir. 2014); *see also Fauley v. Metropolitan Life Ins. Co.*, No. 14 CH 1518 (Ill. Cir. Ct.) (Mot. Prelim. Approval Class Action Settlement Agreement, Ex. A, ¶ 4, filed July 30, 2014). The proposed settlement here eschews this device in favor of automatic distribution to all class members based on the number of fax ads successfully sent.

**a. Cannon & Associates**

Glenoaks and its counsel believe the case against Cannon is strong. Cannon was at the center of the fax-blast campaigns: It prepared the ad copy, selected the fax number targets, and executed the blasts through Westfax. There is substantial evidence that the faxes were unsolicited, in violation of the TCPA's basic prohibition. After receiving fax numbers from Billian, Cannon did not ask recipients for permission to send fax advertisements. (Cordero Decl. Ex. A (Cave Dep. I 42:5-43:11).) The company asserted that members of industry trade groups had agreed to its faxes by submitting their fax numbers for inclusion in a membership directory. (ECF No. 148-3 (Brown Decl., Ex. E), pp. 7-8.) Glenoaks found no evidence to support this assertion (*see* ECF No. 145-1, p. 34), and the FCC has rejected the argument that advertisers have permission to send fax ads to any fax number listed in a trade directory. *See* In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14129, ¶ 193 (2003).

None of the faxes contained the required disclosures of recipients' right to stop future junk faxes. (Cordero Decl. ¶ 31.) The act requires opt-out disclosures to the extent an advertiser asserts an "established business relationship" defense. *See* § 227(b)(1)(C)(i)-(iii). The FCC later extended this requirement to *solicited* faxes. *See* 47 C.F.R. 64.1200(a)(4)(iii), (iv). In 2014, however, the commission "waived" Cannon's compliance with its regulation (*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 02-278, 05-338, FCC 14-164, Order, ¶ 27 n.99 (Oct. 30, 2014)), and the regulation itself has been challenged in an appeal now pending in the District of Columbia Circuit. *See Bais Yaakov of Spring Valley v. FCC*, No. 14-1234 (D.C. Cir.). Cannon also argued that it had substantially complied with the opt-out notice requirements in any event, although the FCC has rejected this defense. *See* Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 29 F.C.C. Rcd. 13998, 14012, ¶ 33 (2014). In short, the legal effect of Cannon's failure to include compliant opt-out disclosures was uncertain.



PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

Cannon's theoretical exposure to the class is nothing short of massive: If Cannon were found to have violated the TCPA for all 2.4 million junk fax transmissions, the minimum statutory damages would be $1.2 billion. But a class-wide judgment against Cannon would be largely uncollectable. By the time litigation had commenced, Cannon had spun off from the RehabCare/Kindred Healthcare network and was a standalone service enterprise owned solely by Charles Cave. (Cave Decl. ¶ 1; *see also* ECF No. 157-4, ¶ 3.) It has modest revenues and significant liabilities, which has been confirmed by testimony from Charles Cave. (*See* Cave Decl. ¶¶ 2-6.) Cave confirms that Cannon's revenue cannot cover the company's outstanding liabilities, and that the company still owes almost $1 million on the loan he took out to buy the business. (*Id.*)

Courts universally recognize that practical limitations on a class defendant's ability to satisfy a judgment are highly relevant to the fairness question. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("potential bankruptcy reorganization...would have left little if anything for class members"); *Kmiec v. Powerwave Techs., Inc.*, No. SACV1200222CJCJPRX, 2016 WL 5938709, at *3 (C.D. Cal. July 11, 2016) (serious questions about defendant's financial condition support class settlement approval); *Johnson v. Quantum Learning Network, Inc.*, No. 15-CV-05013-LHK, 2017 WL 747462, at *1 (N.D. Cal. Feb. 27, 2017) (same); *see also Redman v. RadioShack Corp.*, 768 F.3d 622, 632 (7th Cir. 2014).

As a practical matter, therefore, a class judgment against Cannon would be collectable only to the extent of available insurance. As noted earlier, the only insurance available to satisfy a judgment against Cannon are two Homeland policies, which collectively provide $8 million liability protection. But RehabCare is also insured under these policies and is presumptively equally entitled to their protection. *See Lehto v. Allstate Ins. Co.*, 31 Cal. App. 4th 60, 72 (1994) ("An insurer owes the duty of good faith and fair dealing to each of its insureds, and cannot favor the interests of one insured over the other."); *Shell Oil Co. v.*

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

*National Union Fire Ins. Co.*, 44 Cal. App. 4th 1633, 1645-47 (1996) (insurer must treat co-insureds equally in allocating available policy indemnity limits). Glenoaks and its counsel therefore regard half, or $4 million, as available to satisfy any Cannon liability.

**b. RehabCare Group**

Although RehabCare is a much larger company than Cannon, Glenoaks would face a much tougher path to establish its liability. RehabCare vigorously argued that Cannon alone was responsible for the junk fax operation. (*See, e.g.*, ECF No. 162; Cordero Decl. ¶ 33.) Although Glenoaks disagreed, several risks must be taken into account.

The primary risk was establishing that RehabCare was liable for the "Polaris Group" fax operation. Direct liability under the TCPA is imposed on the fax "sender." *See* 47 C.F.R. § 64.1200(f)(10); *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1255 n. 9 (11th Cir. 2015). There are two "blended" theories of sender liability. *City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*, No. CV 13-4595 (NLH/JS), 2015 WL 5769951, at *10 (D.N.J. Sept. 29, 2015). "The first theory of liability applies to 'the person or entity' on 'whose behalf' a third party transmits an unsolicited facsimile advertisement[.] The other theory of liability applies to the person or entity 'whose goods or services are advertised or promoted in the unsolicited advertisement.'" *Id.* (internal quotations and citation omitted). Courts have restricted goods and services liability to prevent liability for advertisements that are unauthorized. *See, e.g.*, *Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 8:13-CV-01592-AEP, 2014 WL 7224943, at *6 (M.D. Fla. Dec. 17, 2014).

RehabCare denied that it was liable under either theory. RehabCare contended that none of the faxes advertised its goods or services. All 2,149 fax ad campaigns promoted "Polaris Group" products and services. A small subset—95 campaigns—also mentioned RehabCare, primarily manuals "[d]eveloped by RehabCare Group." (Porter Decl. ¶¶ 2-6, Ex.

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

E.) There were 78,240 successful transmissions of these advertisements. (*Id*. ¶¶ 7-9, Ex. F.) On summary judgment, RehabCare denied that it was liable merely because its name was mentioned in these faxes. RehabCare contended that it did not sell the manuals, did not ask Cannon to sell them, and did not receive any sales revenue. (ECF No. 162, p. 8.) RehabCare also argued that the faxes were not sent on its behalf. (*Id*., pp. 9-16.) RehabCare equated the "on its behalf" standard to vicarious liability, which it claimed was inapplicable. (*Id*.) RehabCare relied heavily on a Central District of California decision, which found no liability for a franchisor that was not actively involved in an allegedly illegal text messaging campaign. (*Id*. (citing *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal 2012)).)

Glenoaks and its attorneys were prepared to oppose RehabCare's summary judgment motion. Glenoaks believed evidence established that RehabCare authorized or approved at least some fax campaigns, and, as noted earlier, some campaigns overtly offered services by Cannon and RehabCare. For instance, in 2011, faxes were sent to promote "Public Seminars" concerning changes in Medicare reimbursement. (Porter Decl. Exs. E and F, nos. 55-95.) The seminars were sponsored and paid for by RehabCare (*id*. Ex. A (Cave Dep. I 76:15-78:5)), and included presentations by RehabCare personnel. (*Id*. (Cave Dep. I 89:9-90:9).)[12]

Glenoaks also believed RehabCare had potential exposure for all faxes on an agency or vicarious liability theory. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016) (acknowledging federal common-law agency principles apply to TCPA violations); *In re DISH Network, LLC*, 28 F.C.C. Rcd. 6574, 6590 n. 124 (2013). Glenoaks believed there was evidence that RehabCare had the ability to control Cannon and its fax-blasting operation. *See Roylance v. ALG Real Estate Servs*., No. 5:14-cv-02445-PSG, 2015 WL 1522244, at *5 (N.D.

[12] There was some evidence suggesting that RehabCare was the registrant of polaris-group.com website identified in the faxes. (Porter Decl. ¶ 9, Ex. G.) But Cannon denied this and provided testimony that Cannon owned and controlled the website at all times. (Cordero Decl. Ex. B (Ballard Dep. 64:8-14).)

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

Cal. Mar. 16, 2015). But Cave testified that RehabCare had nothing to do with the fax operation—it didn't retain WestFax, it didn't prepare the ad copy, it didn't review the ad copy, it didn't select fax number targets for the campaigns, and it didn't execute the fax-blasts. This was corroborated by testimony from RehabCare representatives. (*See* ECF No. 157-7, p. 3.)

RehabCare also asserted a partial statute of limitations defense. (*See* ECF No. 10, p. 8.) The complaint was filed December 29, 2014, and the federal four-year limitations period applies to TCPA claims. 28 U.S.C. § 1568 (a). RehabCare contended that any claims based on transmissions before December 29, 2010, were barred by limitations. (*See* ECF No. 10, p. 8.) If successful, this would have insulated RehabCare from liability for fully 52,000 of the 78,000 "RehabCare" faxes. (*See* Porter Decl. Ex. F.)

Glenoaks disagreed, and argued that claims from July 2010 forward were preserved under the *American Pipe* doctrine, which tolls the statute of limitations for unnamed class members from the commencement of a putative class case until it is voluntarily dismissed or the class certification question is determined. *See American Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). Glenoaks contends that two prior putative class actions, the Ballard Nursing Center and Pines Nursing Home litigations, tolled the running of limitations for six months.[13] Courts generally toll limitations under *American Pipe* when certification is denied in a prior case for reasons other than inherent deficiencies in the class. *See Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1149 (9th Cir. 2000) (*en banc*); *see also Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 564 (7th Cir. 2011); *Great Plains Trust Co.*

---

[13] In 2010, Ballard Nursing Center commenced TCPA litigation against "Polaris Group, Inc.," in the Circuit Court of Cook County, Illinois (10CH43451). (*See* Cordero Decl. ¶ 7.) The case settled on an individual basis and was dismissed in early 2012. (*Id*. Ex. A.) In January 2014, Pines Nursing Home, a Miami facility, brought putative class claims against RehabCare and Cannon in the Southern District of Florida based on the same "Polaris Group" faxes. (*Id.* ¶ 8.) The case settled and was dismissed on an individual basis after the court denied class certification on the sole ground that Pines would not be an adequate class representative. (*Id.*)

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

*v. Union Pac. R. Co.*, 492 F.3d 986, 997 (8th Cir. 2007). RehabCare, however, argued that limitations wouldn't be tolled based on an Eleventh Circuit decision holding that a prior denial of class certification precludes *American Pipe* tolling. *See Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir. 1994). Glenoaks and its legal team believe they had the better side of the issue, but there was some risk RehabCare could successfully bar claims for two-thirds of the "RehabCare" faxes.

An adverse litigation outcome was not the only risk facing Glenoaks and the class. Absent a settlement, litigation would likely continue for years. Through protracted legal battles over every issue, Defendants and their capable legal teams have proved to be tenacious adversaries. If, as Glenoaks expects, the Court would have certified the class, Defendants likely would have sought immediate appellate review under Rule 23(f). (*See* Cordero Decl. ¶ 29.) A detour to the Ninth Circuit would have delayed class relief for at least a year. Even after the eventual trial, any recovery could be delayed by yet another appeal. Absent a settlement, Defendants would be sure to continue their vigorous defense. Any ultimate recovery would be years away, reducing the present value of a judgment.

Sober consideration of these risks explains why class counsel strongly recommend settlement approval.[14] (Cordero Decl. ¶ 23; Fischbach Decl. ¶ 11; Magolnick Decl. ¶ 10.) Settlement enables the class to recover the only Cannon asset realistically available—Cannon's presumed 50 percent share of the $8 million liability insurance. From RehabCare, therefore, the class will effectively recover $21 million. This amounts to 54 percent of the $39.1 million base damages the class could have recovered if RehabCare were found liable for

---

[14] The recommendation of class counsel with experience in the subject matter is a strong factor favoring settlement. *See Gribble v. Cool Transps. Inc.*, No. CV 06-04863, 2008 WL 5281665, at *9 (C.D. Cal. Dec. 15, 2008); *see also Gerardo v. Quong Hop & Co.*, No. C 08-3953 JF (PVT), 2009 WL 1974483, at *2 (N.D. Cal. July 7, 2009) (fact that proponents of settlement are experienced in this type of litigation supports preliminary approval); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979).

all faxes that mention its name.[15] Given RehabCare's liability and limitations defenses and the inherent risk of an adverse certification ruling, this is an outstanding result. *Compare Villegas v. J.P. Morgan Chase & Co.*, No. 09-00261 SBA (EMC), 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (settlement at 15 percent of liability preliminarily fair); *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (settlement between 25 and 35 percent reasonable).

The certainty of a $25 million recovery today is far preferable to the numerous risks and uncertainties of continued litigation, years down the road.

## II. Certification of the Proposed Settlement Class Is Fully Warranted

Glenoaks respectfully urges the Court to certify the proposed settlement class. A class may be certified solely for purposes of settlement if a settlement is reached before a litigated determination of the class certification issues. *Emmons v. Quest Diagnostics Clinical Labs., Inc.*, No. 1:13-CV-00474-DAD-BAM, 2016 WL 3418452, at *2 (E.D. Cal. June 22, 2016) (Drozd, J.); *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1121 (E.D. Cal. 2009). The first step is to make a conditional determination whether a class exists. *Id.*; *see Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Defendants have stipulated to the formation of the settlement class. (ECF No. 171 (CASA) ¶ 2.) Even absent this stipulation, the settlement class easily meets the requirements for certification under Rules 23(a) and (b)(3).

---

[15] In a recent decision, the Court deducted attorneys' fees for purposes of comparing the settlement recovery against the potential liability. *See Aguilar*, 2017 WL 117789, at *5. In that case, however, attorneys' fees were potentially recoverable from the defendants if litigation had continued. *Id.* In this case, the TCPA contains no attorneys' fees clause and fees would have been payable from the class recovery if the case had proceeded to judgment. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-82 (1980).

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

### A. This Case Satisfies All Rule 23(a) Prerequisites for Class Certification

#### 1. The class is numerous

The class members are numerous, making their individual joinder impracticable. FED. R. CIV. P. 23(a)(1). Although there is no bright line rule, classes with 35-40 persons or more usually meet this requirement. *See Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds, County of Los Angeles v. Jordan*, 459 U.S. 810 (1982); *see also Emmons*, 2016 WL 3418452, at *2. This element is easily satisfied here: Transmission records identify almost 13,000 class members. (ECF No. 146 (Biggerstaff Decl.) ¶ 16.) *See Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *8 (E.D. Cal. Jan. 11, 2017) (Drozd, J.) (4,557 members satisfies requirement).

#### 2. There are common issues affecting all class members

Rule 23(a)(2) requires only that class members share at least one common question of law for fact. A common core of facts or law satisfies this requirement. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). This case comfortably satisfies this minimum standard. The case rests on a common core of law and fact – the same type of faxed advertisements, transmitted through the same means, in violation of the same statute, with each class member seeking the same relief.

#### 3. Glenoaks' claims are typical of those held by the class

Typicality is satisfied if the representative's claims arise from the same course of conduct as the class claims and are based on the same legal theory. *Emmons*, 2016 WL 3418452, at *3. The class representative's claims must merely be "reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon v.*

*Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Here, Glenoaks' claims are typical of the proposed class because Glenoaks received the same type of faxes sent to other class members, in the same manner as all class members and has the same claims under the TCPA as all other class members.

**4. Glenoaks and Its Counsel Will Fairly and Adequately Protect the Class**

Rule 23(a)'s final requirement is that the class representative must "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). A class representative is adequate when (a) there is no conflict of interest between the representative and its counsel and absent class members, and (b) the representative and its counsel will "prosecute the action vigorously on behalf of the class." *In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). "The emphasis has been and should be placed on whether the representative's counsel is capable." *Weinberger v. Jackson*, 102 F.R.D. 839, 845 (N.D. Cal. 1984), *receded on other grounds by In re Seagate Techs. Sec. Litig.*, 115 F.R.D. 264 (N.D. Cal. 1987).

Glenoaks has no conflicts with other class members. (LeVine Decl. ¶ 7.) The hospital's administrator, Henry E. LeVine, Jr., will be an excellent class representative. He is a well-educated, experienced businessperson, and for over a decade has operated Glenoaks. (*Id.* ¶ 1.) LeVine, like many businesses and consumers, dislikes junk faxes and wants to stop them. (*Id.* ¶ 6.) He is committed to this case, understands the claims made, and has fully carried out his duties as putative class representative. (*Id.*) LeVine, using his independent judgment, fully endorses the proposed settlement. (*Id.* ¶ 11.)

Likewise, Glenoaks' attorneys are highly experienced litigators with deep experience in complex and class litigation. (Cordero Decl. ¶¶ 36-37; Fischbach Decl. ¶¶ 1-5; Magolnick Decl. ¶¶ 2-6.) Glenoaks' counsel have extensive class experience, including claims for



PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

violations of the anti-junk fax laws. (Cordero Decl. ¶¶ 36-37; Fischbach Decl. ¶¶ 2-5; Magolnick Decl. ¶¶ 2-6.) In 2015, for instance, members of Glenoaks' legal team obtained three large court-approved TCPA recoveries, including the record $40 million Interline Brands recovery in the Northern District of Illinois. (Cordero Decl. ¶ 37.a.)

Glenoaks' attorneys have diligently prosecuted this action. They have consistently pursued discovery from Defendants, including prosecuting several motions to compel discovery. (Brown Decl. ¶¶ 3-12; Cordero Decl. ¶¶ 5-6.) They have obtained extensive written discovery and thousands of documents. (*See* Brown Decl. ¶¶ 4-8; Cordero Decl. ¶¶ 5.) Numerous rounds of depositions have occurred nationwide, from New York to Los Angeles, and in between. (Cordero Decl. ¶ 6.) Glenoaks has engaged multiple experts to assist in the case. Glenoaks' legal team has devoted well over 5,000 hours to prosecuting this case. (Cordero Decl. ¶ 3; Fischbach Decl. ¶ 12; Magolnick Decl. ¶ 7.)

**B. The Proposed Class May Be Maintained Under Rule 23(b)(3)**

**1. Common questions predominate this case**

The first Rule 23(b) requirement is that "questions of law or fact common to class members predominate over questions affecting only individual members of the class." FED. R. CIV. P. 23(b)(3). The rule doesn't require that all questions of fact or law be common—or, conversely, that no individual issues exist—but only that some questions are common and that they predominate over the individual questions. *Local Joint Exec. Bd. v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001); *see Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134-1135 (9th Cir. 2016).

The predominance question is not even a close call in the vast majority of junk fax cases. Class-wide issues predominate because liability for mass junk fax transmissions

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

necessarily focuses on standardized conduct by the defendant. As two courts have explained, "[t]he evidence determinative of Defendant's liability concerns 'transmissions' of the allegedly illegal fax, and in substantial part 'do[es] not relate to the individual recipients.'" *A & L Indus., Inc. v. P. Cipollini, Inc.*, No. 12-07598 (SRC), 2013 WL 5503303, at *3 (D.N.J. Oct. 2, 2013) (quoting *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 338 (E.D. Wis. 2012), *aff'd*, 704 F.3d 489 (7th Cir. 2013)).

This case presents numerous common questions:

1. **Are the faxes advertisements?** Only fax advertisements are subject to the act. *See* § 227(a)(5). RehabCare and Cannon both deny that the faxes were ads. (*See* ECF No. 10 (RehabCare Answer) ¶¶ 13-17; ECF No. 21 (Cannon Answer) ¶¶ 13-16; Cave Dep. 29:17-30:20.) Courts recognize the advertisement issue is a classic common question. *Ira Holtzman, CPA, & Assocs., Ltd. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1318 (2014).

2. **Who is legally responsible for sending the faxes?** Defendants' liability for the illegal fax-blast operation is another class-wide issue. The TCPA places direct liability on any "sender," which the FCC defines as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent *or* whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10) (emphasis supplied); *see Imhoff Invest., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 634 (6th Cir 2015). Although Cannon admits that it was a sender, RehabCare vigorously denies that it was a sender or otherwise is liable for the "Polaris Group" junk faxes. (*See* ECF No. 10 (RehabCare Answer), p. 5.) As a result, the case presents several common issues surrounding RehabCare's legal responsibility for the alleged violations.

3. **Defendants' EBR defense.** Both Defendants assert the "established

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

business relationship" defense. (*See* ECF No. 10 (RehabCare Answer), p. 7:1-10; ECF No. 21 (Cannon Answer), p. 10:1-6.) Because a compliant opt-out disclosure in the faxes is a necessary element of this defense (§ 227(b)(1)(C)(i)-(iii)), this is another issue subject to common proof.

4. **Defendants' PEP defense.** Whether recipients gave prior express permission to receive the junk faxes is an important—and common—issue. In this case, Cannon (and later, RehabCare) bought the fax telephone numbers from a third party, Billian Publishing. (ECF No. 162-1, ¶ 35; Cordero Decl. Ex. A (Cave Dep. I 35:18-20, 47:5-12; Pickering Dep. 64:20-65:8).) When, as here, advertisers broadcast junk faxes en masse to telephone numbers bought from a third party, courts universally regard the PEP question as a common issue. *See, e.g.*, *Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 186 (E.D. Pa. 2014); *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 296 F.R.D. 299, 314 (D.N.J. 2013).

5. **Can Defendants avoid liability based on technical defenses?** Defendants contended that they can escape liability because WestFax didn't use a "regular telephone line" to broadcast the junk faxes. Defendants sponsored expert testimony from Ray Horak, who contends that WestFax likely used circuits other than what Horak calls a "regular telephone line" to deliver the faxes. (Cordero Decl. ¶ 28, Ex. D.) While Horak's theory has been rejected by several courts, the defense presents common issues. *See, e.g., American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, No. 1:09-cv-1162, 2013 WL 3654550, at *4 (W.D. Mich. July 12, 2013), *aff'd*, 757 F.3d 540 (6th Cir. 2014).

**2. A class action is the superior method of adjudication**

The second Rule 23(b) element—superiority of class adjudication—is easily satisfied here. The class action device was designed for this case: a large number of claims that would be uneconomical to pursue on an individual basis. As the Supreme Court stressed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). This explains why courts routinely hold that "proceeding as a class is a superior method of adjudicating TCPA violations..." *Mussat v. Global Healthcare Resource, LLC*, No. 11 C 7035, 2013 WL 1087551, at *7 (N.D. Ill. Mar. 13, 2013). Indeed, "resolution of the issues on a classwide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value), would be an efficient use of both judicial and party resources." *Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008). The same reasoning holds true here; a class action is a superior method of adjudicating this matter.

## III. The Proposed Manner and Content of Class Notice Are Appropriate and Adequate

The settlement establishes a robust, informative notice plan. Rule 23(e) requires the "best notice that is practicable under the circumstances." Indeed, courts have consistently recognized that Rule 23(e) and due process do not require that every class member receive actual notice, as long as the selected method will likely apprise interested parties. *See, e.g., Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

The notice plan is designed not only to apprise interested parties, but to reach a high percentage of class members. First, a "short-form" notice will be sent via facsimile to the same fax telephone numbers to which Defendants sent the ads. (ECF No. 171 (CASA) ¶ 7.) If fax transmission fails after three attempts, the administrator will send the notice by First

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

Class mail. For any mail that is returned as undeliverable, the administrator will attempt to identify the member through reverse look-up and other searches. (*Id.* ¶ 7, Ex. 1.)[16]

The short-form notice will inform class members that they can visit the settlement website to download a more detailed notice, the complete settlement agreement, and other court documents. The settlement website, www.rehabcaresettlement.com, will be maintained throughout the notice period by KCC. On the website, class members will be able to access the critical pleadings, class notices, and class member information forms for class members to provide changes to payment information. The website will also provide answers to the most frequently asked questions regarding the settlement, including pending deadlines. KCC will also maintain a toll-free number for class members to call to find out more information.

The substance of the notice also meets Rule 23(e)'s requirements. "A class action settlement notice 'is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Emmons*, 2016 WL 3418452, at *8 (quoting *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). The proposed notices accomplish this. (ECF No. 171 (CASA) Exs. 1, 4.) They inform the class of the nature of the claims; outline the key settlement terms; explain how members' payments will be calculated; disclose that attorneys' fees will be sought by class counsel (and the maximum amount), and that Glenoaks will seek a service award; explain how members may opt out or object, and the deadlines for doing so. (*Id.*) The notices identify the last day for class members to exclude themselves. They inform class members that the settlement is binding and that they will release claims unless they opt

[16] Glenoaks and Cannon worked together to identify addresses for over 93 percent of the class. (Nemec Decl. ¶¶ 9-10); Campagne Decl. ¶¶ 2-9.) Many of the addresses were located in the 2013 Billian list. (Campagne Decl. ¶ 6.) Defendants purchased the comprehensive information from Billian so that they would be able to target their marketing efforts. (Cordero Decl. Ex. B (Cave Dep. I 35:10-20).) These profiles contain company names and contact information. (Nemec Decl. ¶¶ 6-11.)

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

out. (*Id.*) Class members also receive information about how to object to settlement, and where they can file and serve the necessary documents. (*Id.*) The notice informs members that they can obtain further information from the Court's files, by visiting the settlement website, or by calling the settlement administrator. (*Id.*) The notice plan easily satisfies Rule 23(e).

## Conclusion

The proposed settlement agreement should be preliminary approved and a settlement class preliminarily certified for the settlement. The parties agreed to a form of a proposed Preliminary Approval Order (ECF No. 171 (CASA), Ex. 5), which is concurrently lodged herewith. The following table sets forth relevant dates and deadlines outlined in the proposed order, predicated on the settlement receiving preliminary approval:

| **Event** | **Timing** |
|---|---|
| Deadline for parties to submit Master Facsimile Transmission Database to the Settlement Administrator | Within 7 calendar days after Order granting Preliminary Approval |
| Deadline for Settlement Administrator to send the notice, Class Member Information Form, and Form W9 (if applicable) to class members | Within 21 calendar days after Order granting Preliminary Approval |
| Deadline for class members to deliver opt-out requests to the Settlement Administrator | July 14, 2017 |
| Deadline for Settlement Administrator to file Exclusion Report | July 19, 2017 |
| Deadline for Defendants to terminate | Within 10 days after filing of Exclusion |

PAYNE & FEARS LLP
ATTORNEYS AT LAW
1100 GLENDON AVENUE, SUITE 1250
LOS ANGELES, CALIFORNIA 90024
(310) 689-1750

| | |
|---|---|
| settlement | Report |
| Deadline for Plaintiff to file Motion for Final Approval of Settlement | August 1, 2017 |
| Deadline for Plaintiff and Class Counsel to file Motion for Attorneys' Fees and Costs, and Motion for Incentive Award | August 1, 2017 |
| Deadline for class members to file objections to Motion for Final Approval of Settlement, Motion for Attorneys' Fees and Costs, and Motion for Incentive Award | August 15, 2017 |
| Deadline for parties to file replies in support of Final Approval, Motion for Attorneys' Fees, and Motion for Incentive Award | August 29, 2017 |
| Deadline for class members to deliver Class Member Information Form and completed Form W-9 to the Settlement Administrator | September __, 2017 |
| Hearing on Final Settlement Approval, Motion for Attorneys' Fees and Costs, and Motion for Incentive Award | September __, 2017, 9:30 A.M. |

DATED: March 21, 2017

Payne & Fears LLP

By: */s/ C. Darryl Cordero*
C. Darryl Cordero
One of the Attorneys for Plaintiff Dakota Medical, Inc., dba Glenoaks Convalescent Hospital, individually and on behalf of all others similarly situated

4847-1423-4435.11