1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DAKOTA MEDICAL, INC., a California          No. 1:14-cv-02081-DAD-BAM
     corporation doing business as Glenoaks
12   Convalescent Hospital,

13                 Plaintiff,                      ORDER GRANTING PRELIMINARY
                                                   APPROVAL OF CLASS ACTION
14          v.                                     SETTLEMENT

15   REHABCARE GROUP, INC., a Delaware            (Doc. No. 172)
     corporation, and CANNON &
16   ASSOCIATES, LLC, a Delaware limited
     liability corporation doing business as
17   Polaris Group,

18                 Defendants.

19

20          This matter is before the court on plaintiff's unopposed motion for preliminary approval

21   of a class action settlement and certification of the settlement class. (Doc. No. 172.) Oral

22   argument was heard on April 18, 2017. Attorneys Darryl Cordero, Donald Fischbach, Scott

23   Luskin, and Joel Magolnick appeared at the hearing on behalf of plaintiffs. Attorney Oliver

24   Wanger appeared on behalf of defendant RehabCare and attorneys Erin Kolmansberger, and

25   David Jordan appeared on behalf of defendant Cannon. At the conclusion of the hearing, the

26   matter was taken under submission. For the reasons set forth below, the court will grant

27   plaintiff's motion.

28   /////

                                                   1

**BACKGROUND**

The complaint in this action was filed on December 29, 2014, alleging violations of the Telephone Consumer Protection Act ("TCPA"). (Doc. No. 1.) This court has jurisdiction over the case because it arises under the laws of the United States. *See* 28 U.S.C. § 1331; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 375–76 (2012) (holding federal courts have jurisdiction over private TCPA suits).

Plaintiff[1] alleges defendants violated the TCPA and various regulations promulgated by the Federal Communications Commission ("FCC") by sending more than 2.4 million transmissions of junk faxes to long-term care facilities throughout the country. (Doc. No. 1 at ¶ 3.) These junk faxes were advertisements for various seminars, manuals, DVDs, and programs on Medicare and Medicaid billing and other human resources management topics. (*Id.* at ¶ 13.) The faxes invited recipients to visit defendants' website, www.polaris-group.com, to purchase the advertised goods and services. (*Id.*) According to plaintiff, there were more than 2,100 different advertisements included in the 2.4 million fax transmissions. (*Id.* at ¶ 14.) The complaint alleges that defendants purchased lists of fax numbers for more than 12,000 long-term care facilities from a third party, Billian Publishing, Inc., and had no reason to believe these health care providers had given their permission to receive these advertisements. (*Id.* at ¶ 15.) Further, the advertisements allegedly failed to include opt-out notices mandated by federal law. (*Id.* at ¶ 16.) Defendants purportedly hired an outside company, WestFax, Inc., to carry out the fax advertising campaign *en masse*. (*Id.* at ¶ 17.) While defendant Cannon & Associates (doing business as Polaris Group) was directly responsible for the advertising campaign, plaintiff maintained RehabCare was vicariously liable for the TCPA violations, because its products and services were marketed and it benefited from the junk fax campaign. (*Id.*)

The court's docket reflects extensive litigation of this suit, including resolution by the court of numerous informal discovery disputes and motions to compel with respect to discovery. Plaintiff filed a contested motion to certify the class on October 3, 2016. (*See* Doc. Nos. 145,

---

[1] There was previously more than one named plaintiff in this action, but plaintiff R. Fellen, Inc. was voluntarily dismissed in August 2016. (*See* Doc. Nos. 136, 137.)

164.) Shortly thereafter, defendant RehabCare Group, Inc. filed a motion for summary judgment, arguing in large part that the two defendants were separate entities and defendant RehabCare Group bore neither direct nor vicarious liability for Cannon's actions. (*See* Doc. No. 162.) Approximately a month after the filing of the motion for summary judgment, the court received notice on November 22, 2016 that the class action had been settled, and the then-pending certification and summary judgment motions were terminated. (Doc. Nos. 169, 170.) Plaintiff filed this unopposed motion for preliminary approval of the settlement and certification of a settlement class on March 21, 2017. (Doc. No. 172.)

The proposed class for this settlement is defined as "all persons that were subscribers of facsimile telephone numbers to which there was a successful transmission of one or more facsimiles by Defendants (or either of them) between July 17, 2010, and February 4, 2014, in broadcasts by WestFax Inc." (Doc. No. 171 at 6.) Officers, directors, and other agents of Defendants and/or their affiliated companies are expressly excluded from the class, as are governmental entities and attorneys of record in this action. (*Id.*) The settlement is structured as a common fund for $25 million, and seeks appointment of plaintiff as class representative, and attorneys C. Darryl Cordero of Payne & Fears LLP, Donald R. Fischbach of Dowling Aaron Inc., and Joel S. Magolnick of Marko & Magolnick, P.A. as class counsel. (*Id.* at 6–7.) The release states that the class members who do not opt out of the settlement will release defendants, affiliated companies, and their agents "for all claims, whether known or unknown based on the transmission of the Faxes and/or the Action." (Doc. No. 171 at 14.) This release, by its terms, pertains only to claims brought in this action, and only to the faxes sent to the class as defined above. (*See id.* at 4, 6 (defining terms "Faxes" and "Action").)

## LEGAL STANDARD

Rule 23 mandates that, "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The following procedures apply to the court's review of such a proposed settlement:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

3

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

. . .

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

*Id.*

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation and internal quotations omitted). To protect the rights of absent class members, Rule 23(e) of the Federal Rules of Civil Procedure requires that the court approve all class action settlements "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946. However, when parties seek approval of a settlement agreement negotiated prior to formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946. Thus, the court must review such agreements with "a more probing inquiry" for evidence of collusion or other conflicts of interest than is normally required under the Federal Rules. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Bluetooth*, 654 F.3d at 946.

When parties seek class certification for settlement purposes only, Rule 23 "demand[s] undiluted, even heightened, attention" to the requirements for certification. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Although here the parties do not dispute that the class exists for the purposes of settlement, the court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing. *See, e.g., Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. 2014); *West v. Circle K Stores, Inc.*, No. 04-cv-0438 WBS GGH, 2006 WL 1652598, at *2 (E.D. Cal. June 13, 2006).

/////

4

Review of a proposed class action settlement ordinarily proceeds in three stages. *See Manual for Complex Litigation (4th) § 21.632.* First, the court conducts a preliminary fairness evaluation and, if applicable, considers preliminary class certification. *Id.* Second, if the court makes a preliminary determination of the fairness, reasonableness, and adequacy of the settlement terms, the parties are directed to prepare the notice of certification and proposed settlement to the class members. *Id.* Third, the court holds a final fairness hearing to determine whether to approve the settlement. *Id.*; *see also Narouz v. Charter Commc'ns, Inc.*, 591 F.3d 1261, 1266–67 (9th Cir. 2010).

Prior to formal class certification, a preliminary fairness determination is appropriate "[i]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *Lounibos v. Keypoint Gov't Solutions Inc.*, No. 12-00636, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)); Newberg on Class Actions § 13:13 (5th ed. 2011); *see also Dearauju v. Regis Corp.*, Nos. 2:14-cv-01408-KJM-AC, 2:14-cv-01411-KJM-AC, 2016 WL 3549473 (E.D. Cal. June 30, 2016) ("Rule 23 provides no guidance, and actually foresees no procedure, but federal courts have generally adopted [the process of preliminarily certifying a settlement class].").

## ANALYSIS

1. *Preliminary Evaluation of Fairness of Proposed Class Action Settlement*

First, the court must conduct a preliminary fairness evaluation of the proposed class action settlement, pursuant to Rule 23(e). While it is not a court's province to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," a court should weigh the strength of a plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the stage of the proceedings; and the value of the settlement offer. *Chem. Bank v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992); *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). The court should also watch for collusion between class counsel and defendant. *Id.* A preliminary

fairness determination is appropriate "[i]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079.

a. Negotiations

This settlement is clearly the product of serious, substantial, and arms-length negotiations. Early in the case, in June 2015, defense counsel proposed mediation, which was not agreed to by plaintiff's counsel until after some discovery was completed. (Doc. No. 172-7 at ¶ 7) (Decl. of Fischbach). Plaintiff's counsel engaged in almost two years' worth of discovery, serving several sets of interrogatories, requests for admission, and Rule 34 requests for production of documents. (Doc. No. 172-2 at ¶ 5) (Decl. of Cordero). This resulted in production of approximately 70,000 documents and 900 pages of written responses. (*Id.*) Several depositions—more than a dozen, all told—were taken by both plaintiff and defendants. (*Id.* at ¶¶ 5–6.) Both the evidence submitted by plaintiff as well as the court's own docket show extensive litigation relating to discovery in this matter. (Doc. No. 172-9 at ¶¶ 6–12; *see also* Doc. Nos. 44, 65, 68, 72, 75 (informal discovery dispute conferences); Doc. Nos. 66, 83, 84, 96, 106, 121 (motions to compel)).

The first mediation in this case occurred on May 12, 2016 in Los Angeles. (Doc. No. 172-7 at ¶ 8 ) (Decl. of Fischbach). That full day session ended with the parties apparently far apart on many key terms, including both the settlement amount and the structure of any proposed settlement fund. (*Id.*) Subsequently, plaintiff's counsel discussed with defense counsel for defendant Cannon the possibility of a settlement with that defendant only, for the combined $8 million limit of its two liability insurance policies. (Doc. No. 172-2 at ¶ 13) (Decl. of Cordero). That offer was rejected, but purportedly opened the door to further mediation. (*Id.*) Litigation continued for a number of months until a two-day mediation took place in Washington, D.C. in November 2016. (Doc. No. 172-7 at ¶ 9) (Decl. of Fischbach). At that negotiation, the two sides reached a settlement amount and a structure for the settlement on the first day, and spent the second day negotiating other terms of the settlement. (*Id.*; *see also* Doc. No. 172-2 at ¶ 16) (Decl. of Cordero). A sheet depicting the terms of the agreement was finalized and signed by all parties

a week later.  (Doc. No. 172-7 at ¶ 9) (Decl. of Fischbach); Doc. No. 172-2 at ¶¶ 16, 18 (Decl. of Cordero)).   Nevertheless, it took the parties several more months of negotiations to agree on a completed class action settlement agreement.  (Doc. No. 172-2 at ¶¶ 19–22) (Decl. of Cordero).

Based upon this history, the court is convinced these negotiations were extensive, involved, and non-collusive, lending weight to the fairness of the settlement.

### b.  Deficiencies

A proposed settlement does not meet the test for preliminary fairness if there are any obvious deficiencies in the proposed agreement.  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079.  This settlement calls for the establishment of a common fund of $25 million.  (Doc. No. 171 at 7.)  Distribution of the funds will be divided based on the number of successful fax transmissions included within the settlement class, with each class member entitled to a share based on the number of faxes involved in the settlement that they received.  (*Id*.)  Payments for attorneys' fees, expenses, and an incentive award for the class representative are to be paid from the common fund, and settlement is not conditioned on any particular award of those.  (*Id.* at 9.)  The settlement provides a means for class members to exclude themselves from the settlement.  (*Id.* at 12.)  Payments from the common fund that are not successfully delivered to class members will be divided among remaining class members, with no reversionary interest remaining with defendants.  (*Id.* at 13–14.)  The release of liability appears reasonably tailored to the claims presented in the action.  (*Id.* at 14–15.)  The settlement agreement provides for a settlement administrator to coordinate notice to the class, any requests for exclusion, and payments to class members upon final approval.  (*Id.* at 8–9, 12.)  The court is satisfied there are no obvious deficiencies with this settlement.

### c.  Preferential Treatment

For a proposed settlement to pass a preliminary fairness determination, the proposed settlement must not provide preferential treatment to certain members of the class or the named plaintiffs.  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079.  As noted above, the settlement terms provide for the settlement fund to be divided among class members in proportion to the number of junk faxes received by that class member.  This is, at least preliminarily, a fair

and reasonable way to distribute the settlement. The court therefore turns to the attorney's fees provisions, the anticipated incentive fees, and the other administrative costs.

When a negotiated class action settlement includes an award of attorneys' fees, the fee award must be evaluated in the overall context of the settlement. *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result, the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund. *Id.*; *Rodriquez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009). Similarly, while "[i]ncentive awards are fairly typical in class action cases," *Rodriquez*, 563 F.3d at 958–59, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . [C]oncerns over potential conflicts may be especially pressing where . . . the proposed service fees greatly exceed the payments to absent class members." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citations omitted).

The settlement agreement provides for no specific award of either attorneys' fees or class representative incentive awards. (Doc. No. 171 at 9.) Counsel represent in their briefs that they will ultimately seek an award of attorneys' fees of no more than one-third of the fund. (*See* Doc. No. 172-1 at 24.) They will also eventually seek a $15,000[2] incentive payment for the named plaintiff here. (*Id.* at 25.) Neither of these is outside the realm of what may be reasonable, contingent on a sufficient showing, and provides no cause for the court to hesitate in finding the settlement preliminarily fair. *See Morales v. Stevco, Inc.*, No. 1:09-cv-00704, 2011 WL 5511767 AWI JLT, at *12 (E.D. Cal. Nov. 10, 2011) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the

---

[2] The court notes the class notice indicates plaintiff will seek a $25,000 payment. Plaintiff's counsel also noted this at the hearing on the pending motion, explaining that plaintiff would be reducing the incentive payment sought to $15,000. *See Taylor v. FedEx Freight, Inc.*, No. 1:13-cv-01137-DAD-BAM, 2016 WL 6038949, at *8 (E.D. Cal. Oct. 13, 2016) (reducing incentive payment from $25,000 to $15,000). The notice to be sent to class members and posted on the website should reflect this change in the incentive payment sought prior to distribution.

benchmark.") (quoting *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)). *See also Taylor v. FedEx Freight, Inc.*, No. 1:13-cv-01137-DAD-BAM, 2016 WL 6038949, at *8 (approving a $10,000 incentive award); *Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014) (approving $15,000 incentive payments).

The administrative costs sought—budgeted at approximately $94,000—are somewhat higher than in other proposed settlements submitted to this court for review. *See Syed v. M-I, L.L.C.*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *2 (E.D. Cal. Feb. 22, 2017) (administration costs up to $11,500 for $7 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for $4.5 million settlement); *Mitchinson v. Love's Travel Stops & Country Stores, Inc.*, No. 1:15-cv-01474-DAD-BAM, 2016 WL 7426115, at *1 (E.D. Cal. Dec. 22, 2016) (administration costs up to $20,000 for $290,000 settlement). That said, the settlement administrator proposes to host a case website throughout the remainder of the action until final settlement approval, as well as a toll-free telephone support hotline, which are more technically involved than in other settlements this court has had occasion to approve. (*See* Doc. No. 172-18 at 6.) Additionally, a number of the costs are only estimated at this point, such as the approximately $15,600 budgeted for postage. (*See* Doc. No. 172-5) (itemized estimated budget from settlement administrator). In short, the settlement is larger, and therefore will require more extensive involvement on the part of an administrator, than the other settlements referenced above. None of the proposed payments to class counsel, the class representative, or the settlement administrator make the court question the preliminary fairness of this settlement.

d. Range of Possible Approval

To evaluate the fairness of the settlement award, the court should "compare the terms of the compromise with the likely rewards of litigation." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). To determine whether a settlement "falls within the range of possible

approval" a court must focus on "substantive fairness and adequacy," and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

The total proposed settlement is for $25 million, which will be paid proportionally to class members based on the number of junk faxes received. Plaintiff represents the average recovery appears to be approximately $1,950 per class member. (Doc. No. 172-1 at 27.) According to plaintiff, the statutory damages for the 2.4 million violations of the TCPA would be $1.2 billion. (*Id.* at 29.) Thus, the settlement is for approximately two percent of the total liability, in plaintiff's estimation.

In justifying what may appear to be at first glance a low settlement amount in light of the total potential liability, plaintiff provides several explanations. First, plaintiff notes that this is the minimum liability for defendant Cannon, against which plaintiff believes it has the strongest case. (*See* Doc. No. 172-1 at 28.) It is undisputed for purposes of this motion that defendant Cannon, and not defendant RehabCare, actually orchestrated the sending of the faxes and that there was no *express* permission given to Cannon by the recipients allowing Cannon to lawfully send these advertisements. (*See* Doc. No. 172-4 at 8 (Deposition of Charles Cave); Doc. No. 148-3 at 4–5 (suggesting implicit permission was received either due to existing business relationships, attendance at trade shows, and/or membership in trade associations).) Further, plaintiffs maintain the FCC has rejected any argument that permission is given to fax ads simply because fax numbers are listed in the directory of a trade association. *See* In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14129, ¶ 192 (2003). Plaintiff also asserts that defendant Cannon did not include appropriate opt-out disclosures mandated by federal law in its advertising faxes. (Doc. No. 172-2 at ¶ 31) (Decl. of Cordero).

However, any sizable judgment against defendant Cannon would likely have been in large part uncollectable. Cannon (dba Polaris) was apparently spun off from RehabCare in September 2014, and is no longer an affiliate of RehabCare (Doc. No. 157-4 at ¶ 3) (Decl. of Charles Cave). Charles Cave, prior chief operating officer of Cannon/Polaris, acquired an ownership interest in September 2014 and is the sole member of the company. (Doc. No. 172-11 at ¶ 1)

(Decl. of Cave).  Cannon/Polaris owes $1.225 million on a bank loan, and has other debts of approximately $870,000.  (*Id.* at ¶¶ 2–6.)  The company currently has assets worth approximately $670,000.  (*Id.* at ¶ 5.)  The only significant asset the company has to pay a judgment is its liability insurance with policy limits of $8 million.  (*Id.* at ¶ 7.)  Moreover, this insurance policy apparently also covered defendant RehabCare, and it is plaintiff's understanding that only $4 million from the policy was available to indemnify Cannon/Polaris.  (Doc. No. 172-1 at 29–30.)

Further, while RehabCare is a substantially larger company, proving liability against it would also be substantially more difficult.  Direct liability under the TCPA is imposed on the "sender" of unsolicited advertisements.  *See* 47 C.F.R. § 64.1200(a)(4).  The term "sender" in the regulations means "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement."  *Id.* § 64.1200(f)(10).  Because of this, some courts have limited liability where the plaintiff cannot prove that the advertising of defendant's goods and services was authorized.  *See Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 8:13-cv-01592-AEP, 2014 WL 7224943, at *6–7 (M.D. Fla. Dec. 17, 2014).  Defendant RehabCare has maintained that none of its goods or services were advertised in the faxes and that the faxes were not sent on its behalf.  (*See* Doc. No. 162) (RehabCare's Motion for Summary Judgment).  Some of the faxes at issue mentioned that certain manuals for sale had been "[d]eveloped by RehabCare Group," or otherwise include RehabCare's name in a header along with other references.  (*See* Doc. No. 172-15.)  Nevertheless, according to defendant RehabCare, the manuals at issue were sold only by Cannon/Polaris, and none of its property, goods, or services were advertised or promoted and no faxes were sent on its behalf.  (Doc. No. 162 at 13–18.)  Similarly, while plaintiff believed defendant RehabCare was liable on a theory of vicarious liability because it retained the ability to control Cannon/Polaris and its junk fax sending, defendant Cannon's owner, Charles Cave, testified that RehabCare had no involvement in the faxes.  (*See* Doc. No. 157-4 at ¶¶ 11–14 - Decl. of Cave) (stating that RehabCare not involved in the creation of the faxes, was not asked for input, review, approval, and the faxes were sent by Cannon without consulting or informing RehabCare).)

/////

Only approximately 78,000 of the 2.4 million faxes specifically mentioned RehabCare as discussed above. (*See* 172-14 at ¶¶ 6–9) (Decl. of Courtney Porter). Plaintiff represents that these faxes could have warranted up to $39.1 million in damages against defendant RehabCare directly. (Doc. No. 172-1 at 33–34.) Presumably, the rest of the $1.2 billion would only be recoverable if RehabCare was held vicariously liable for Cannon/Polaris.[3] Plaintiff also notes defendant RehabCare has advanced a partial statute of limitations defense to some of these claims which, if successful, would remove liability for approximately 52,000 of the 78,000 faxes bearing RehabCare's name. (Doc. No. 172-1 at 32.) While plaintiff disagrees with this asserted defense, and notes that tolling of the statute of limitations should apply here, it acknowledges "there was some risk RehabCare could successfully bar claims for two-thirds of the 'RehabCare' faxes." (Doc. No. 172-1 at 32–33; *see also* Doc. No. 172-2 at ¶¶ 33–34 (Decl. of Cordero) (noting concerns regarding the merits of plaintiff's liability case against defendant RehabCare).)

Aside from the merits-based defenses facing plaintiff, counsel notes that there was the risk of delay inherent even in a successful motion for class certification against RehabCare. Any successful class certification decision was likely to be subject to an interlocutory appeal, and counsel believed there was "a not insignificant chance the Ninth Circuit would grant interlocutory review." (Doc. No. 172-2 at ¶ 29) (Decl. of Cordero).

Several of plaintiff's attorneys state that they believe the terms are fair and reasonable, and the best that could have been achieved by way of settlement. (Doc. No. 172-2 at ¶ 23 (Decl. of Cordero); Doc. No. 172-7 at ¶ 11 (Decl. of Fischbach); Doc. No. 172-8 at ¶ 10 (Decl. of Joel Magolnick).) The concerns about the inability to recover a large judgment from Cannon, the higher risk of both certifying a class and proving liability against RehabCare, the risks of further delay in recovery through various procedural aspects of litigation, and the risks inherent in any continued litigation are sufficient to warrant settling this matter for significantly less than the total statutory penalties that may have been awarded under ideal circumstances. The court concludes that this settlement amount falls within the range of possible approval such that it passes, at the

---

[3] There is no evidence before the court about whether defendant RehabCare has sufficient assets to satisfy a judgment of that size.

very least, preliminary muster.

Accordingly, the court finds the settlement agreement in this case to be fair for the purposes of preliminary approval of the settlement.

### 2. *Preliminary Certification of the Settlement Class*

In order to preliminarily certify a class,[4] the court must find all of the requirements of Rule 23(a) are met. *See Hanlon*, 150 F.3d at 1019. As a threshold matter, in order to certify a class, a court must be satisfied that:

> (1) the class is so numerous that joinder of all members is impracticable (the "numerosity" requirement); (2) there are questions of law or fact common to the class (the "commonality" requirement); (3) the claims or defenses of representative parties are typical of the claims or defenses of the class (the "typicality" requirement); and (4) the representative parties will fairly and adequately protect the interests of the class (the "adequacy of representation" requirement).

*In re Itel Securities Litigation*, 89 F.R.D. 104, 112 (N.D. Cal. 1981) (citing Fed. R. Civ. P. 23(a)).

Once each of these threshold requirements set out under Rule 23(a) is satisfied, a class may be certified if the class action satisfies the predominance and superiority requirements of Rule 23(b)(3). *See Amchem*, 521 U.S. at 615 ("To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond Rule 23(a) prerequisites: Common questions must

---

[4] The 2003 Amendments to Federal Rule of Civil Procedure 23 eliminated the provision stating that class certification orders "may be conditional," and circuit courts have subsequently reached different conclusions about the continued viability of conditional or preliminary certification of settlement classes under the amended rule. *Compare Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of America*, 453 F.3d 179, 186 n.8 (3d Cir. 2006) ("[T]he 2003 amendments to the Rule eliminated so-called "conditional" certifications—formerly available under Rule 23(c)(1)(C)"); *with Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006) (concluding that "conditional certification survives the 2003 amendment to Rule 23(c)(1)"). In the absence of Ninth Circuit guidance on the issue, this court will not depart from the procedure commonly employed by district courts in this circuit of certifying settlement classes on a preliminary basis for settlement purposes, and deferring final class certification until after the fairness hearing. *See Denney*, 443 F.3d at 269 (noting that federal district courts "continue to employ this practice," and that the process of "preliminary" certification is endorsed by the Manual for Complex Litigation and Moore's Federal Practice). Before granting preliminary certification, the court nonetheless must carry out a searching, rather than a cursory, Rule 23 analysis. *See Amchem Prods., Inc.*, 521 U.S. at 622 (requiring "undiluted, even heightened attention [to Rule 23 requirements] in the settlement context"); *cf. Pointer*, 2016 WL 696582, at *5 ("[D]espite the Supreme Court's cautions in *Amchem* . . . a cursory approach appears the norm").

'predominate over any questions affecting only individual members,' and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'") First, the common questions must "predominate" over any individual questions. While this requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is much higher at this stage of the analysis. *Dukes*, 564 U.S. at 359; *Amchem*, 521 U.S. at 624–25; *Hanlon*, 150 F.3d at 1022. While Rule 23(a)(2) can be satisfied by even a single question, Rule 23(b)(3) requires convincing proof the common questions "predominate." *Amchem*, 521 U.S. at 623–24; *Hanlon*, 150 F.3d at 1022. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022. Rule 23(b)(3) also requires a court to find "a class action is superior to other available methods for the fair adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). As one district court has summarized:

> In resolving the Rule 23(b)(3) superiority inquiry, the court should consider class members' interests in pursuing separate actions individually, any litigation already in progress involving the same controversy, the desirability of concentrating in one forum, and potential difficulties in managing the class action—although the last two considerations are not relevant in the settlement context.

*Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM, 2015 WL 4078135, at *6 (E.D. Cal. July 2, 2015) (citing *Schiller v. David's Bridal Inc.*, No. 10-0616, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

a. Rule 23(a)

i. *Numerosity*

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the proposed class contains 12,976 unique fax numbers to which the junk faxes were allegedly sent. (Doc. No. 146 at ¶ 16.) This is easily sufficient to make joinder of all class members as plaintiffs impracticable. *See Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 449 (E.D. Cal. 2013) (numerosity met with approximately 3,500 class members); *Orvis v. Spokane Cty.*, 281 F.R.D. 469, 473 (E.D. Wash. 2012) (numerosity met with 260 class

members); *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 594 (E.D. Cal. 2008) (approximately one thousand members).

### ii. Commonality

Rule 23 requires there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy Rule 23(a)'s commonality requirement, a class claim "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. As the Supreme Court has further explained, this frequently necessitates an inquiry that "overlap[s] with the merits of plaintiff's underlying claim." *Id.* at 351. Thus, in *Dukes*, the question was whether Wal-Mart engaged in a pattern or practice of discrimination, which required looking at "a particular employment decision." *Id.* at 352. The Supreme Court concluded that type of claim, under the facts presented, could not be common among the various class members, because there was no evidence of a "general policy of discrimination." *Id.* at 352–53. Here, there are numerous common threads of both fact and law: whether defendants had permission to send the allegedly junk faxes; whether defendants' opt-out notice on the allegedly junk faxes was sufficient; and whether RehabCare was vicariously liable for Cannon/Polaris's campaign of faxed advertisements. Commonality is therefore satisfied.

### iii. Typicality

Typicality is satisfied if the representative's claims arise from the same course of conduct as the class claims and are based on the same legal theory. *See, e.g., Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (claims are typical where named plaintiffs have the same claims as other members of the class and are not subject to unique defenses). Under the rule's "permissive standards," representative claims are typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Plaintiff's president and administrator, Henry LeVine, Jr., declares that he regularly reviewed the faxes sent to plaintiff, and they frequently included unwanted fax advertisements from parties with whom plaintiff did not do business. (Doc. No. 172-10 at ¶¶ 1, 3, 4) (Decl. of

LeVine). LeVine states plaintiff has "received numerous junk faxes over the years promoting products and services offered by 'Polaris Group.' A few faxes have also mentioned 'RehabCare Group.'" (*Id.* at ¶ 5.) It is clear plaintiff's claims are analogous to the claims alleged by the class as a whole. Therefore, the typicality requirement of Rule 23(a) is satisfied.

*iv.*    *Adequacy of Representation*

Adequacy of representation is met if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit has noted that two criteria for determining this have been recognized: "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). The Ninth Circuit has cautioned that incentive awards for named plaintiffs may, in certain situations, impact the adequacy of those plaintiffs to serve as class representatives. *Radcliffe*, 715 F.3d at 1164–65. Particularly, where an incentive award is specifically conditioned on the named plaintiffs' endorsement of the settlement or where there is a significant disparity between the incentive awards and the typical class member's recovery, plaintiffs' interests may be sufficiently unaligned with the class to find they are not adequate representatives. *Id.*

Plaintiff's attorney Darryl Cordero states that he was chiefly responsible for organizing this litigation and preparing the complaint. (Doc. No. 172-2 at ¶ 2) (Decl. of Cordero). Attorney Cordero has spent almost 1,100 hours on this litigation, while other attorneys and paralegals from his firm have spent more than 3,700 hours on it. (*Id.* at ¶ 3.) According to attorney Cordero, he has thirty-three years of litigation experience in courts around the country, focusing on complex business litigation, including several class action TCPA matters. (*Id.* at ¶¶ 36–37.) These matters included three separate actions involving TCPA claims in recent years that were litigated to settlements of $40 million, $10 million, and $15 million. (*Id.* at ¶ 37(a)–(c).) Attorney Cordero has served as lead counsel in several other complex cases, which include other, non-TCPA class actions. (*Id.* at ¶ 38(a)–(b).) Donald Fischbach, one of the other attorneys of record for plaintiff,

indicates he was admitted to practice law in 1972, and has been attorney of record in numerous class actions, including one litigated to a $115 million verdict and judgment in 2011. (Doc. No. 172-7 at ¶¶ 1–4) (Decl. of Fischbach). Attorney Fischbach participated in both mediations in this case. (*Id.* at ¶¶ 8, 9.) Counsel Joel Magolnick, also an attorney of record for plaintiff here, submitted a declaration noting his extensive experience in class action litigation since 1990. (*See* Doc. No. 172-8 at ¶¶ 1–6.) Attorney Magolnick also participated in both mediations in this action. (*Id.* at ¶¶ 8–9.) It is clear that all class counsel are well-qualified to represent the class.

Additionally, the aforementioned Mr. LeVine notes he has exercised independent judgment throughout his involvement in the litigation to represent the class. (Doc. No. 172-10 at ¶ 7.) He has kept abreast of case developments through his attorneys, coordinated the collection of various documents requested in discovery by defendants, assisted the attorneys in responding to interrogatories, and has appeared for deposition. (*Id.* at ¶ 8.) Mr. LeVine attended the first mediation, and was available by phone during the second mediation. (*Id.* at ¶¶ 9, 10.) According to Mr. LeVine, he has spent between forty-five and fifty-five hours on this case. (*Id.* at ¶ 12.) Further, Mr. LeVine states that he knows "of no conflicting interests between Glenoaks and class members" pertinent to this case. (*Id.* at ¶ 7.) The court finds plaintiff is an adequate class representative.

### b. Rule 23(b)(3)

Aside from the four aforementioned prerequisites to class certification, certification must also meet one of the three requirements of Rule 23(b). *See Amchem*, 521 U.S. at 615. Certification is sought here under Rule 23(b)(3). (Doc. No. 70-1 at 25–26.) This provision requires the court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Again, while this requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is much higher at this stage of the analysis. *Dukes*, 564 U.S. at 359; *Amchem*, 521 U.S. at 624–25; *Hanlon*, 150 F.3d at 1022. Predominance is essentially "an assessment of 'whether proposed classes are sufficiently cohesive to warrant adjudication by

representation.'" *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (quoting *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009)).

Courts regularly certify TCPA cases based on allegedly junk faxes, because the cases frequently concern "'transmission' of the allegedly illegal fax, and in substantial part 'do[ ] not relate to the individual recipients.'" *A&L Indus., Inc. v. P. Cipollini, Inc.*, No. 12-07598 (SRC), 2013 WL 5503303, at *3 (D.N.J. Oct. 2, 2013) (quoting *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 281 F.R.D. 327 (E.D. Wis. 2012)); *see also Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 628 (S.D. Cal. 2015); *Vandervort v. Balboa Capital Grp.*, 287 F.R.D. 554, 562 (C.D. Cal. 2012). Here, there are numerous disputes common to all the faxes at issue— whether the faxes were indeed advertisements, whether RehabCare was liable for faxes sent by Cannon/Polaris, whether the statute of limitations applies, and whether the care facilities' registration with a trade group constituted prior express permission to receive the advertising. (*See* Doc. No. 172-1 at 38–39.) By contrast, there are no apparent individual issues which would weigh against class certification, since the identity of the recipients of the faxes can be determined through defendants' records. This is sufficient for the court to conclude that common issues would predominate over individual ones, thus warranting certification for settlement purposes.

Further, a class action here is superior to any other available method for adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3). Joinder of the more than 12,000 anticipated class members would be virtually impossible, and the amount in controversy (an average recovery of slightly less than $2,000) would likely be far too little to warrant bringing each of these similar claims as individual actions. Further, nothing is before the court suggesting that other individual suits are proceeding on this basis. Finally, class members will be afforded the opportunity to opt out if they wish to pursue an individual suit. Thus, this dispute appears ideally suited for class-wide resolution.

3. *Proposed Class Notice and Administration*

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *see*

*also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). For a class certified under Federal Rule of Civil Procedure 23(b)(3), the notice must contain, in plain and easily understood language, (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) that a class member may appear through an attorney if desired; (5) that the court will exclude members who seek exclusion; (6) the time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on members of the class. Fed. R. Civ. P. 23(c)(2)(B). A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. General Elec.*, 561 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citations omitted).

Here, the proposed short-form class notice will be sent to putative class members via the fax number that was used to send the advertisements to them in the first place. (Doc. No. 172-1 at 40.) If delivery by fax fails three times, the settlement administrator will send the notice via First Class mail to the addresses associated with the fax number in defendants' records, utilizing address location services in the event the mail is returned as undeliverable. (*Id.* at 41.) This short-form notice describes the nature of the action, the prospective class, the claims and issues raised in the action, the terms of the settlement, the proposed attorneys' fees and liability releases, and the time and place of the final fairness hearing. (Doc. No. 171 at 26–27.) The short-form notice sets out the means and deadlines for class members to object to the proposed settlement or to seek to be excluded from the settlement. (*Id.*) It advises class members they may, but are not required to, retain an attorney. (*Id.*) It also notifies prospective class members of the binding effect of the settlement upon them. (*Id.*) The long-form class notice, which plaintiff represents will be available online through the settlement administrator (*see* Doc. No. 172-1 at 41), contains more detailed information with respect to all of the subjects addressed above. (Doc. No. 171 at 35–39.)

Additionally, the plaintiffs propose the following schedule:

/////

/////

| Event | Date |
|---|---|
| Deadline for parties to submit Master Facsimile Transmission Database to the Settlement Administrator | Within seven days of the order granting preliminary approval |
| Deadline for Settlement Administrator to send the notice, Class Member Information Form, and Form W9 (if applicable) to class members | Within twenty-one calendar days after order granting preliminary approval |
| Deadline for class members to deliver opt-out requests to the Settlement Administrator | July 14, 2017 |
| Deadline for Settlement Administrator to file Exclusion Report | July 19, 2017 |
| Deadline for Defendants to terminate settlement[5] | Within ten days after filing of Exclusion Report |
| Deadline for Plaintiff to file Motion for Final Approval of Settlement | August 1, 2017 |
| Deadline for Plaintiff and Class Counsel to file Motion for Attorneys' Fees and Costs, and Motion for Incentive Award | August 1, 2017 |
| Deadline for class members to file objections to Motion for Final Approval of Settlement, Motion for Attorneys' Fees and Costs, and Motion for Incentive Award | August 17, 2017[6] |
| Deadline for parties to file replies in support of Final Approval, Motion for Attorneys' Fees, and Motion for Incentive Award | August 31, 2017[7] |
| Deadline for class members to deliver Class Member Information Form and completed Form W-9 to the Settlement Administrator | September 7, 2017 |
| Hearing on Final Settlement Approval, Motion for Attorneys' Fees and Costs, and | September 7, 2017, 9:30 A.M. |

[5] The settlement provides defendants the right to terminate the settlement agreement if class members with shares equaling more than 4,000 fax transmission were to opt out of the class. (Doc. No. 171 at 12–13.) If class members representing between 2,000 and 4,000 fax transmission opt out of the class, up to $1 million of the settlement amount will be put into escrow to indemnify the defendants from any individual class member's TCPA lawsuit filed within one year of the settlement, to the extent judgment in such a suit exceeds $1 million. (*Id.* at 13.) If the money in escrow is not used to indemnify defendants, it then reverts back to the class.

[6] Initially, plaintiff requested this deadline be set for August 15, 2017, but at hearing on the pending motion requested it be moved back by two days in light of the agreed upon hearing date and in order to provide the maximum amount of time for class members to file objections.

[7] Plaintiff initially sought to have this date scheduled as August 29, 2017, but suggested this date at the hearing on the pending motion.

20

The court finds that the notice and the manner of notice proposed by plaintiff meets the requirements of Federal Civil Procedure Rule 23(c)(2)(B) and that the proposed method of delivery is also appropriate in these circumstances. Further, the court finds the above schedule is appropriate and adopts it.

## CONCLUSION

For the reasons stated above:

1. The court finds the settlement is preliminarily fair, reasonable, and in the best interests of the proposed settlement class;

2. The following settlement class is appropriate for preliminary certification:

> All persons that were subscribers of facsimile telephone numbers to which there was a successful transmission of one or more facsimiles by defendants (or either of them) between July 17, 2010 and February 4, 2014, in broadcasts by WestFax Inc. Excluded from the class are officers, directors, and employees, accountants, and/or agents of defendants; any affiliated company; legal representatives, attorneys, heirs, successors, or assigns of defendants, defendants' officers and directors, or of any affiliated company; any entity in which any foregoing persons have or have had a controlling interest; any members of the immediate families of the foregoing persons; any federal, state and/or local governments, governmental agencies (including the Federal Communications Commission), government entities, government body and any attorneys of record in this action; and any person or entity that has released defendants from all claims based on the transmission of faxes during the entire class period.

3. Plaintiff Dakota Medical, Inc. is designated and appointed representative of the settlement class;

4. C. Darryl Cordero of Payne & Fears LLP is designated and appointed as lead settlement class counsel in this matter, and Donald R. Fischbach of Dowling Aaron and Joel S. Magolnick of Marko & Magolnick P.A. are designated and appointed as settlement class counsel;

5. KCC LLC is designated and appointed as the settlement administrator in this matter;

6. The notices of class action and proposed settlement and class member information forms submitted by plaintiff are appropriate and approved for distribution to class members,

provided they are amended as discussed at the hearing on this motion and as otherwise indicated in this order;

7. The above schedule proposed by the parties is hereby incorporated in full, and all parties, class members, and the settlement administrator shall abide by it, absent good cause being shown or leave of the court being granted; and

8. The settlement administrator is directed to distribute class notice in accordance with the terms of the settlement agreement.

IT IS SO ORDERED.

Dated: __**April 19, 2017**__ _____
UNITED STATES DISTRICT JUDGE