UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAKOTA MEDICAL, INC., a California corporation doing business as Glenoaks Convalescent Hospital,

        Plaintiff,

        v.

REHABCARE GROUP, INC., a Delaware corporation, and CANNON & ASSOCIATES, LLC, a Delaware limited liability corporation doing business as Polaris Group,

        Defendants.

No. 1:14-cv-02081-DAD-BAM

ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARDING ATTORNEYS' FEES AND INCENTIVE PAYMENTS, AND DIRECTING DISTRIBUTION OF SETTLEMENT

(Doc. Nos. 179, 180, 181)

This matter is before the court on three motions filed by plaintiff on August 1, 2017: a motion for final approval of settlement and certification of the settlement class (Doc. No. 179); a motion for attorneys' fees and expenses (Doc. No. 180); and a motion for an incentive payment to be made to class representative Dakota Medical (Doc. No. 181). The motions were heard collectively on September 7, 2017, with attorneys C. Darryl Cordero and Donald Fischbach appearing on behalf of Dakota Medical, Inc. and the class, and attorneys Oliver Wanger, Jon Wilson, and David Jordan appearing on behalf of defendants. Following the hearing, plaintiff submitted supplemental briefing and a final report of the settlement administrator on

/////

1

September 11, 2017.  (Doc. Nos. 187, 188.)  Each of the motions will be granted for the reasons discussed below.

## BACKGROUND

The court granted preliminary certification of a class action settlement in this matter on April 19, 2017.  (Doc. No. 177.)  As the pertinent factual background is set forth in that order, it will not be repeated here.  Following the granting of preliminary approval, the class administrator sent class settlement notices to almost 13,000 class members starting on May 10, 2017.  (Doc. No. 179-13 at ¶ 3.)  Of those, 10,898 were successfully transmitted, and through subsequent research and location of mailing addresses, notices were delivered to 12,489 of the 12,867 class members.  (*Id.* at ¶¶ 3–6.)  Therefore, over 97 percent of the class received notification of the settlement.  No class members have objected, and only one has opted out of the settlement.  (*Id.* at ¶¶ 9–10.)  The settlement administrator declares that, as of the final report, there were 12,302 class members eligible to receive a distribution, to be credited with a total of 2,328,003 shares under the settlement.  (Doc. No. 187 at ¶ 3.)

## FINAL CERTIFICATION OF CLASS ACTION

The court has already evaluated the standards for class certification in its prior order granting preliminary approval of the class action settlement here.  (Doc. No. 177 at 13–18.)  Nothing has been raised subsequently to the court that might affect its prior analysis of whether class certification is appropriate here, and the court has no cause to revisit that analysis.  The court finds final certification of the following class is appropriate:

> All persons that were subscribers of facsimile telephone numbers to which there was a successful transmission of one or more facsimiles by defendants (or either of them) between July 17, 2010 and February 4, 2014, in broadcasts by WestFax Inc.  Excluded from the class are officers, directors, and employees, accountants, and/or agents of defendants; any affiliated company; legal representatives, attorneys, heirs, successors, or assigns of defendants, defendants' officers and directors, or of any affiliated company; any entity in which any foregoing persons have or have had a controlling interest; any members of the immediate families of the foregoing persons; any federal, state and/or local governments, governmental agencies (including the Federal Communications Commission), government entities, government body and any attorneys of record in this action; and any person or

2

entity that has released defendants from all claims based on the transmission of faxes during the entire class period.

C. Darryl Cordero of Payne & Fears LLP is confirmed as lead settlement class counsel, and Donald R. Fischbach of Dowling Aaron and Joel S. Magolnick of Marko & Magolnick P.A. are further confirmed as settlement class counsel. Dakota Medical, Inc. is the representative for this settlement class, and KCC LLC is the settlement administrator in this matter.

## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Class actions require the approval of the district court prior to settlement. Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."). This requires that: (1) notice be sent to all class members; (2) the court hold a hearing and make a finding that the settlement is fair, reasonable, and adequate; (3) the parties seeking approval file a statement identifying the settlement agreement; and (4) class members be given an opportunity to object. Fed. R. Civ. P. 23(e)(1)–(5). The settlement agreement was previously filed on the court docket (Doc. No. 171) and class members have been given an opportunity to object. The court now turns to the adequacy of notice and its review of the settlement following the final fairness hearing.

### A. Notice

"Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)). Any notice of the settlement sent to the class should alert class members of "the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery." *Hanlon*, 150 F.3d at 1025. It is important for class notice to include information concerning the attorneys' fees to be awarded from the settlement, because it serves as "adequate notice of class counsel's interest in the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 963 n.15 (9th Cir. 2003) (quoting *Torrisi v. Tucson Elec. Power Co.*, 8

3

F.3d 1370, 1375 (9th Cir. 1993)) (noting that where notice references attorneys' fees only indirectly, "the courts must be all the more vigilant in protecting the interests of class members with regard to the fee award").

The court previously reviewed the notice of class certification at the preliminary approval stage, and found it satisfactory. (Doc. No. 177 at 18–19.) Notice has been sent to the class, first by facsimile transmission at the numbers forming the basis for the class, and then at mailing addresses for those class members where facsimile transmission failed. (Doc. No. 179-13 at ¶¶ 3–4.) Of the 12,867 potential class members, 10,898 faxed class notices were successfully transmitted. (*Id.* at ¶ 3.) The settlement administrator obtained address information for 1,855 class members out of the 1,969 not contacted by fax, and mailed notice through the U.S. Postal Service. (*Id.* at ¶ 4.) Of the mailed notices, only 276 were returned as undeliverable, and further address reviews allowed an additional twelve of these class members to receive notice of the settlement. (*Id.* at ¶ 5.) Therefore, 12,489 of the 12,867 total class members—or approximately 97 percent—received the class notice the court previously found sufficient.

Of the class members receiving notice, none have objected to the settlement to date. (Doc. No. 184-1 at ¶ 4.) One class member—Robinson Health Care of North Little Rock, Arkansas, representing 286 shares of the ultimate settlement fund—has opted out of the class. (Doc. No. 179-13 at ¶ 9.) No objections were heard at the final fairness hearing held before the court.

The settlement administrator advised the court that it lacks sufficient information to provide settlement proceeds to 564 class members, representing 19,312 shares of the settlement, because information is missing concerning their names and addresses. (Doc. No. 187 at ¶ 4.) Thus, the eligible settlement class consists of 12,303 class members, reflecting the initial class size of 12,867, minus 564 class members for whom there is insufficient identifying information and one class member who opted out. (*Id.*)

Given the above, the court concludes adequate notice was provided to the vast majority of the class here. *Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994) (court need not ensure class members all receive actual notice, only that "best practicable notice" is given); *Winans v.*

*Emeritus Corp.*, No. 13-cv-03962-HSG, 2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort' be made to reach all class members, it does not require that each individual actually receive notice."). The court accepts the reports of the settlement administrator, and finds sufficient notice has been provided so as to satisfy Federal Rule of Civil Procedure 23(e)(1).

## B. Final Fairness Hearing

On September 7, 2017, the court held a final fairness hearing, at which class counsel and defense counsel appeared. No class members, objectors, or counsel representing the same appeared at the hearing. The court now determines that the settlement is fair, adequate, and reasonable. *See* Fed. R. Civ. P. 23(e)(2).

In assessing whether a district court's determination of the fairness of a class action settlement was within its discretion, the Ninth Circuit Court of Appeals balances the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C.*, 361 F.3d at 575; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964–67 (9th Cir. 2009). These settlement factors are non-exclusive, and not each need be discussed if they are irrelevant to a particular case. *Churchill Vill., L.L.C.*, 361 F.3d at 576 n.7. While the Ninth Circuit has observed that "strong judicial policy . . . . favors settlements," *id.* at 576 (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)), where the parties reached a settlement agreement prior to class certification, the court has an independent duty on behalf of absent class members to be vigilant for any sign of collusion among the negotiating parties. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (noting "settlement class actions present unique due process concerns for absent class members," because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall

5

settlement in return for a higher attorney's fee") (internal quotations and citations omitted).

In particular, where a class action settlement agreement was reached prior to a class being certified by the court, "consideration of these eight *Churchill* factors alone is not enough to survive appellate review." *In re Bluetooth*, 654 F.3d at 946–47. District courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. These more subtle signs include: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds," and therefore carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal citations and quotations omitted). The Ninth Circuit has also recognized that a version of a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to a certain amount. *Lane v. Facebook, Inc.*, 696 F.3d 811, 832 (9th Cir. 2012); *In re Bluetooth*, 654 F.3d at 947; *In re Toys R Us-Delaware, Inc.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling.") (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 520 n.1 (1st Cir. 1991)).

While this court has wide latitude to determine whether a settlement is substantively fair, it is held to a higher procedural standard and "must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Allen v. Bedolla*, 787 F.3d 1218, 1223–24 (9th Cir. 2015) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)). Thus, while the court should examine any relevant *Churchill* factors, the failure to review a pre-class certification settlement for those subtle signs of collusion identified above may also constitute error. *Id.* at 1224–25.

### 1. Strength of the Plaintiffs' Case

Here, plaintiff believes its case against defendant Cannon was strong. Henry LeVine, plaintiff's president and administrator, declares that the Glenoaks Convalescent Hospital regularly receives advertising faxes from businesses with whom Glenoaks does not do business and who have not been given permission to send such advertisements. (Doc. No. 179-2 at ¶¶ 1–4.) The faxes disrupt the operations of the business, waste personnel resources, and consume paper unnecessarily. (*Id.* at ¶ 4.) Particularly, plaintiff received numerous junk faxes offering books, manuals, and services from both Polaris Group and RehabCare Group. (*Id.* at ¶ 5.) Despite consulting with his staff and reviewing business records, LeVine could determine no business relationship Glenoaks had with either group. (*Id.*) Defendants acknowledged they could find no evidence of having done business with plaintiff. (Doc. No. 179-4 at 4.) They suggested that plaintiff was a member of the California Association of Health Facilities ("CAHF"), and that this membership granted defendants permission to send faxes to plaintiff. (*Id.* at 5.) However, plaintiff was not a member of CAHF, which at any rate had not published a membership directory since at least 2006. (Doc. No. 179-2 at 3, n.1; Doc. No. 149-10 at ¶ 8.)

However, as discussed in the order preliminarily approving class settlement, proving liability against defendant RehabCare would likely have been more difficult. RehabCare has maintained that none of its goods or services was advertised in the faxes and the faxes were not sent on its behalf. (Doc. No. 177 at 11.) While there was some evidence that might point to liability for defendant RehabCare, it was far from certain the plaintiff class would prevail against it. (*Id.*) Therefore, while plaintiff had potentially meritorious claims, it is far from certain that they would have prevailed on those claims against both defendants.

### 2. Risk, Expense, Complexity, and Likely Duration of Further Litigation

As also previously discussed, the fact that plaintiff might not prevail against defendant RehabCare is of special significance in this case, because defendant Cannon has only limited assets and is essentially judgment-proof in excess of its insurance policies. (Doc. No. 177 at 10–11; *see also* Doc. No. 179-3 at ¶ 7 (Decl. of Cordero).) Moreover, even RehabCare would be unable to satisfy the maximum potential judgment of $1.2 billion. (*Id.* at 10.) This amount would

"result in a certain bankruptcy for RehabCare." (Doc. No. 179-14 at ¶ 4) (Decl. of Robert Sherwin). While plaintiff notes it is somewhat more likely defendant RehabCare would have been liable for $39.1 million based on the 78,240 faxes that specifically advertised RehabCare products (Doc. No. 179-1 at 16), even that amount "would be at the upper end of RehabCare's ability to pay and might, instead, result in bankruptcy." (Doc. No. 179-14 at ¶ 4.) It is therefore clear that, in this case, there was significant risk in continuing to pursue litigation, particularly in the hopes of achieving a significantly larger recovery which would almost certainly be uncollectable.

Further, this case was one of some complexity. As the court discussed in its preliminary approval order, the court's docket reflects extensive litigation in this case. (Doc. No. 177 at 2–3.) Besides numerous discovery disputes, contested class certification and summary judgment motions had been filed prior to a settlement being reached by the parties. (Doc. Nos. 145, 162, 164.) Significant legal obstacles faced the class in the event litigation continued. The risk and complexity of the suit supports approval of the settlement.

### 3. Risk of Maintaining Class Action Status Throughout Trial

As mentioned, the parties here seriously contested the certification of a class. (*See* Doc. Nos. 145–56 (motion to certify class and supporting documents); Doc. Nos. 164–168 (oppositions to motion and supporting documents).) Defendants filed well over 1,000 pages of materials supporting their opposition to the class certification motion. (*See* Doc. Nos. 164, 166–168.) While the court has no occasion to decide what the end result of a contested class certification motion here would have been, defendants' oppositions were not frivolous. Defendants claimed that because consent is a valid defense to claims under the Telephone Consumer Protection Act ("TCPA"), there would have been thousands of individual inquiries into the consent or lack thereof from various class members which would not have been susceptible of common proof. (Doc. No. 164 at 21–30; Doc. No. 165 at 35–38.) While such arguments are commonly heard from defense counsel in class actions, they are not wholly without merit. Attorney Cordero also notes in his declaration that defendants intended to argue that the faxes were not transmitted over a "regular telephone line," a requirement for liability under the TCPA. (Doc. No. 179-3 at ¶ 6,

8

n.1.)  Sustaining the matter as a class action throughout trial may have proved challenging for plaintiff and the class.

### 4.    Amount Offered in Settlement

The amount offered in settlement is $25 million.  This is less than, but on a similar order of magnitude with, the $39.1 million in claims most likely to be sustained against defendant RehabCare.  While the settlement amount represents only a fraction of the potential total liability of $1.2 billion, this amount would have been both difficult to prove and likely impossible to collect.  Further, the plaintiffs have presented evidence that this is the third-largest TCPA settlement in the Ninth Circuit in the last decade.  (*See* Doc. No. 179-1 at 20; Doc. No. 179-9; Doc. No. 179-10.)  The amount offered supports settlement here.

### 5.    Extent of Discovery Completed and the Stage of the Proceeding

The court has detailed the voluminous discovery completed here in its prior order, including multiple informal discovery conferences and motions to compel spanning over two years and including more than a dozen depositions, in addition to the exchange of more than 70,000 documents.  (Doc. No. 177 at 6.)  The significant effort displayed by counsel on both sides bolsters this court's conclusion that the settlement is fairly reached.

### 6.    Experience and Views of Counsel

Plaintiff's counsel Cordero declares that he strongly supports final approval of this settlement, which represents the best possible outcome for the class "by far."  (Doc. No. 179-3 at ¶ 4.)  Attorney Cordero lays out the risks of continued litigation, not only in relation to the certification motion and the collectability of a judgment, but also concerning various merits-stage defenses defendants were likely to raise.  (Doc. No. 179-3 at ¶¶ 6–7.)  Attorney Cordero has 34 years' worth of litigation experience, and has practiced complex business litigation for much of that period, including serving as lead counsel in a number of other class actions.  (*Id.* at ¶¶ 18–20.)  Additionally, the other class counsel—attorneys Magolnick and Fischbach—similarly submitted declarations indicating they are well-versed in class action litigation and fully support the settlement in this case.  (Doc. No. 179-6 at ¶¶ 2–6, 11; Doc. No. 179-7 at ¶¶ 2–5, 8.)

/////

### 7. Presence of a Government Participant

Pursuant to 28 U.S.C. § 1715(b), defendants provided notice to the U.S. Attorney General and the relevant government officials for all fifty states, the District of Columbia, Guam, Puerto Rico, and the Virgin Islands. (Doc. No. 173 at ¶ 8; Doc. No. 174 at ¶ 6.) This notice was provided by defendant RehabCare on March 28, 2017 and by defendant Cannon on April 7, 2017. (Doc. No. 173 at ¶ 8; Doc. No. 174 at ¶ 6.) More than 90 days have elapsed since notice was given, and this court has received no objections to this settlement from federal or state officials. 28 U.S.C. § 1715(d); *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1075 (9th Cir. 2017).

### 8. Reaction of the Class Members to the Proposed Settlement

As mentioned previously, no class members have objected to the settlement, and only one has opted out of being included in it, suggesting general approval of the class for the settlement.

### 9. Subtle Signs of Collusion

The court now turns to a review of whether any of the "more subtle signs" of collusion noted by the Ninth Circuit are present here. *See In re Bluetooth*, 654 F.3d at 947. The award of attorneys' fees sought here—one-third of the settlement fund—is on the high end of amounts typically awarded in the Ninth Circuit. *See Morales v. Stevco, Inc.*, No. 1:09-cv-00704, 2011 WL 5511767 AWI JLT, at *12 (E.D. Cal. Nov. 10, 2011) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.") (quoting *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)). That said, the proposed attorneys' fees award is not disproportionate to the significant monetary distribution the class will receive. Additionally, there are no "clear sailing" provisions here, and settlement of the claims is expressly not conditioned on the approval of fees, costs, and expenses to class counsel under the settlement agreement. (Doc. No. 171 at 9.) Class counsel's attorneys' fees and costs are to be paid from the common fund, and will not be paid separately by defense counsel. (*Id.*) Finally, there is no reversionary clause in the agreement, which specifically states "[d]efendants shall have no reversionary or other interest in the Common Fund or excess funds not distributed to Settlement Class Members." (Doc. No. 171 at 14.) The court is satisfied that none of the subtle signs of collusion present in some class action settlements are apparent here. The court

therefore finds that the settlement is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e).

### C.     Tax Identification Number Deficiency Notice

On August 31, 2017, plaintiff filed a status report.  (Doc. No. 184.)  In that status report, plaintiff noted that there are 8,555 class members who are eligible to receive $600 or more in proceeds.  (*Id.* at 3.)  Plaintiff represents this is the threshold which triggers certain reporting requirements with the Internal Revenue Service ("IRS").  (*Id.*)  In order to file the necessary reporting documents, the settlement administrator requires the Taxpayer Identification Numbers (TINs) for the class members, which it does not have for 8,135 of the class members.  (*Id.*)  According to plaintiff, without these, the IRS will assess penalties on settlement administrators and class members for failing to submit Form W-9s and 1099s, even if the settlement administrator appropriately withholds tax payments and sends these to the IRS.  (*Id.*)  Plaintiff has already sent deficiency notices to these class members, to which they have not responded.  (*Id.*)  Plaintiff requests the court order the settlement administrator KCC to send additional deficiency notices to these members in advance of the distribution.  (*Id.*)  The court finds plaintiff's request to be appropriate and therefore directs administrator KCC to send additional deficiency notices to the members for whom KCC lacks TIN information.  Additionally, KCC is authorized to pay class members who fail to return TIN information to it following the second deficiency notice in annual installments of less than $600 each.

### ATTORNEYS' FEES

### A.     Attorneys' Fees

This court has an "independent obligation to ensure that the award [of attorneys' fees], like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *In re Bluetooth*, 654 F.3d at 941.  This is because, when fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial."  *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  As such, the district court assumes a fiduciary role for the class members in evaluating a request for an award of attorneys' fees from the common fund.  *Id.*; *see also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012);

11

1    *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

2        Because this case is premised on federal question jurisdiction (Doc. No. 1 at 1), federal

3  law governs the award of attorneys' fees.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047

4  (9th Cir. 2002) ("Because Washington law governed the claim, it also governs the award of

5  fees."); *see also* 10 Fern M. Smith, *Moore's Federal Practice* Civil § 54.171 (2015) ("In cases

6  within the district courts' federal-question jurisdiction, state fee-shifting statutes generally are

7  inapplicable.")  "Under Ninth Circuit law, the district court has discretion in common fund cases

8  to choose either the percentage-of-the-fund or the lodestar method" for awarding attorneys' fees.

9  *Vizcaino*, 290 F.3d at 1047.  The Ninth Circuit has generally set a 25 percent benchmark for the

10 award of attorneys' fees in common fund cases.  *Id.* at 1047–48; *see also In re Bluetooth*, 654

11 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee

12 award, providing adequate explanation in the record of any 'special circumstances' justifying a

13 departure.").  Reasons to vary the benchmark award may be found when counsel achieves

14 exceptional results for the class, undertakes "extremely risky" litigation, generates benefits for the

15 class beyond simply the cash settlement fund, or handles the case on a contingency basis.

16 *Vizcaino*, 290 F.3d at 1048–50; *see also In re Online DVD-Rental*, 779 F.3d at 954–55.

17 Ultimately, however, "[s]election of the benchmark or any other rate must be supported by

18 findings that take into account all of the circumstances of the case."  *Vizcaino*, 290 F.3d at 1048.

19 The Ninth Circuit has approved the use of lodestar cross-checks as a way of determining the

20 reasonableness of a particular percentage recovery of a common fund.  *Id.* at 1050 ("Where such

21 investment is minimal, as in the case of an early settlement, the lodestar calculation may convince

22 a court that a lower percentage is reasonable.  Similarly, the lodestar calculation can be helpful in

23 suggesting a higher percentage when litigation has been protracted."); *see also In re Online DVD-*

24 *Rental*, 779 F.3d at 955.

25       Counsel here presents numerous reasons for awarding an above-benchmark recovery of

26 one-third of the settlement fund:  (1) the result is exceptional, because it is the third-largest TCPA

27 settlement in the Ninth Circuit in recent years, yields a $1,339 average member recovery after

28 fees, and does not require class members to make claims in order to receive payments; (2) class

counsel faced a substantial risk of non-payment; (3) a one-third attorney fee recovery is consistent with that in *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200 (C.D. Cal. 2014) and *Hageman v. AT&T Mobility LLC*, No. 13-cv-00050-BLG-RWA, 2015 WL 9855926 (D. Mont. Feb. 11, 2015); (4) class counsel devoted considerable efforts to litigating this case; (5) class counsel was only able to recover on a contingency basis for this action; (6) class counsel are skilled and experienced litigators; (7) the issues involved were complex; (8) there were no objections from class members concerning the attorneys' fees to be sought; and (9) a lodestar cross-check supports the fees.  (Doc. No. 180-1 at 12–26.)  The court addresses those of counsel's arguments it finds pertinent below.

The result achieved in this case is fairly exceptional in proportional terms.  The eligible class members suffered 2,328,003 violations over the class period, as one "share" of the class settlement equals one junk fax transmission.  (*See* Doc. No. 187 at ¶ 3.)  The net distribution to the class is likely to be around $16.4 million.  (Doc. No. 179-13 at ¶ 13.)  This means class members are receiving a payment of approximately $7.00 for each violation.  Moreover, courts regularly use an opt-in procedure in TCPA class actions whereby each class member must file a claim in order to receive any payment.  *Rose v. Bank of Am. Corp.*, No. 5:11–CV–02390–EJD and 5:12–CV–04009–EJD, 2014 WL 4273358, at *5 (N.D. Cal. Aug. 29, 2014) (noting that approximately 228,000 claims had been made out of a potential class of seven million members); *Grannan v. Alliant Law Grp., P.C.*, No. C10-02803 HRL, 2012 WL 216522, at *2–3 (N.D. Cal. Jan. 24, 2012) (observing 1,986 valid claims were made out of almost 138,000 potential class members).  Here, there is no opt-in procedure, and settlement checks will be automatically sent to each of the class members for whom there is a name and address.  (Doc. No. 171 at 13–14.)  Distributed over the entirety of a class, rather than just the individuals who submitted claim forms, this settlement recovers more on a per-violation basis than many TCPA settlements of which this court is aware.  *See Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) ($1.20 per violation recovery); *Wilkins v. HSBC Bank Nev., N.A.*, No. 14 C 190, 2015 WL 890566, at *5–6 (N.D. Ill. Feb. 27, 2015) (approving $2.95 per violation recovery); *In re Capital One Tele. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 789–790 (N.D. Ill. 2015) ($2.72 per

violation recovery); *Rose*, 2014 WL 4273358, at *10 (approximately $4.23 recovery per violation); *Grannan*, 2012 WL 216522, at *2–3 ($4.41 per violation recovery). While the statutory penalties for the claims alleged here range as high as $1,500 per violation, if the violation is willful, 47 U.S.C. § 227(b)(3), it is clear defendants could not satisfy a judgment in the amount of the maximum potential liability, as discussed above.

Class counsel here also faced a substantial risk of non-payment. As the court has already explained, this case was subjected to extensive and serious litigation, discovery, and motion practice. (Doc. No. 177 at 6.) All three law firms representing the class here accepted the matter on a purely contingent basis. (*See* Doc. No. 179-3 at 5, n.4; Doc. No. 179-6 at 3; Doc. No. 179-7 at 2–3.) None would have been compensated at all absent a recovery for the class. "[A]ttorneys whose compensation depends on their winning the case[ ] must make up in compensation in the cases they win for the lack of compensation in the cases they lose." *Vizcaino*, 290 F.3d at 1051 (quoting *In re Wash. Pub. Power Supply*, 19 F.3d at 1300–01).

As discussed above, class counsel devoted significant efforts in litigating this case. (*See* Doc. No. 177 at 6.) Attorney Cordero declares that attorneys at his firm devoted 4,696 hours to this case while paralegals contributed 707 hours. (Doc. No. 179-3 at ¶ 12.) Attorney Magolnick declares he spent more than 132 hours on this case, while attorney Fischbach indicates attorneys at his firm spent 311.5 hours litigating this case. (Doc. No. 179-6 at ¶ 13; Doc. No. 179-7 at ¶ 9.) Therefore, class counsel have spent more than 5,000 hours litigating this case. This, too, supports an above-benchmark award.

The absence of any objections to the settlement also supports the award of attorneys' fees here. The class notices here specifically advised class members that class counsel would seek one-third of the fund for attorneys' fees, as well as reimbursement for any costs for litigation. (Doc. No. 171 at 26, 36.) No objections to the proposed settlement were received, and only one class member opted out of the settlement. Therefore, this attorneys' fee arrangement appears to have the support of the class.

Finally, a lodestar cross-check bolsters the attorneys' fees request further. Where a lodestar is merely being used as a cross-check, the court "may use a 'rough calculation of the

lodestar.'" *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662 OWW MJS, 2011 WL 2648879, at

\*12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-

04149 MMM (SHx), 2008 WL 8150856 (C.D. Cal. July 21, 2008)).  Beyond simply the

multiplication of a reasonable hourly rate by the number of hours worked, a lodestar multiplier is

typically applied.  "Multipliers in the 3–4 range are common in lodestar awards for lengthy and

complex class action litigation."  *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D.

Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988)); *see

also* 4 Newberg on Class Actions § 14.7 (courts typically approve percentage awards based on

lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is comparable to

multipliers used by the courts"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,

148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded

in common fund cases when the lodestar method is applied.") (quoting Newberg).

      This court has previously accepted as reasonable for lodestar purposes hourly rates of

between $370 and $495 for associates, and $545 and $695 for senior counsel and partners.  *See

Emmons v. Quest Diagnostics Clinical Labs., Inc.*, 1:13-cv-00474-DAD-BAM, at \*8 (E.D. Cal.

Feb. 27, 2017).  Some judges in the Fresno division of the Eastern District of California have

approved similar rates in various class action settings, while others have approved lower rates.

*Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 452 (E.D. Cal. 2013) (awarding between

$280 and $560 per hour for attorneys with two to eight years of experience, and $720 per hour for

attorney with 21 years of experience); *Gong-Chun v. Aetna Inc.*, No. 1:09-cv-01995-SKO, 2012

WL 2872788, at \*23 (E.D. Cal. July 12, 2012) (awarding between $300 and $420 per hour for

associates, and between $490 and $695 per hour for senior counsel and partners).  *But see In re

Taco Bell Wage and Hour Actions*, 222 F. Supp. 3d 813, 838–40 (E.D. Cal. 2016) (concluding

that Fresno division rates are $350 to $400 per hour for attorneys with twenty or more years of

experience, $250 to $350 per hour for attorneys with less than fifteen years of experience, and

$125 to $200 per hour for attorneys with less than two years of experience); *Reyes v. CVS

Pharm., Inc.*, No. 1:14-cv-00964-MJS, 2016 WL 3549260, at \*12–13 (E.D. Cal. June 29, 2016)

(awarding between $250 and $380 for attorneys with more than twenty years of experience, and

between $175 and $300 for attorneys with less than ten years' experience); *Rosales v. El Rancho Farms*, No. 1:09-cv-00707-AWI, 2015 WL 4460635, at *25 (E.D. Cal. July 21, 2015) (awarding between $175 and $300 per hour for attorneys with less than ten years of experience and $380 per hour for attorneys with more than twenty years' experience); *Schiller v. David's Bridal, Inc.*, No. 1:10-cv-00616-AWI-SKO, 2012 WL 2117001, at *22 (E.D. Cal. June 11, 2012) (awarding between $264 and $336 per hour for associates, and $416 and $556 per hour for senior counsel and partners). Here, the court generally adopts the hourly rates provided by class counsel for lodestar cross-check purposes as appropriate.[1]

Additionally, counsels' declarations are sufficient to establish the number of attorney hours worked on this matter. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015) ("[I]t is well established that '[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean counting . . . [courts] may rely on summaries submitted by the attorneys and need not review actual billing records.'") (quoting *Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516 (N.D. Cal. Mar. 6, 2014)). Here, counsel represents that more than 5,800 hours have been spent by all attorneys and paralegals on the case. (Doc. No. 180-1 at 22.) Combining the hours counsel represented they spent on the case with the applicable hourly rate, the lodestar base figure here is $2,802,352.50, rather than the $2,972,631 counsel estimated. (See Doc. No. 180-1 at 22.)

Ultimately, class counsel request an award of one-third of the $25 million settlement fund, or $8,333,333. Thus, the lodestar multiplier is approximately 3.0. Multipliers of 3.65 have been approved by the Ninth Circuit. *See Vizcaino*, 290 F.3d at 1051. "Multipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation." *Van Vranken*, 901

---

[1] The rates provided by class counsel range between $215 for paralegals and $775 for lead counsel Cordero. The court will adjust these rates downward somewhat. The prevailing rate for paralegals in the Eastern District of California is on the order of $95 to $115 per hour, and the court applies a rate of $115 per hour here. *See Moore v. Millennium Acquisitions, LLC*, No 1:14-cv-01402-DAD-SAB, 2017 WL 1079753, at *2–3 (E.D. Cal. Mar. 21, 2017); *Trujillo v. La Valley Foods, Inc.*, No. 1:16-cv-01402-AWI-BAM, 2017 WL 2992453, at *5 (E.D. Cal. July 14, 2017). Additionally, class counsel Cordero's rate is adjusted downward to $695 per hour, which is the outside limit recognized for senior counsel and partners in this division of this court. While rates provided for the other attorneys here are likely somewhat higher than would normally be awarded in the Fresno division of the Eastern District of California, the court accepts them as given, in the interest of expediting this "rough calculation." *Bond*, 2011 WL 2648879, at *12.

16

F. Supp. at 298 (citing *Behrens*, 118 F.R.D. at 549). The court finds a 3.0 lodestar multiplier reasonable here for purposes of a cross-check.

Given the above facts as found by this court, an above benchmark award of attorneys' fees is warranted here. Therefore, the request that one-third of the settlement fund be awarded as attorneys' fees will be granted.

### B.     Distribution of Attorneys' Fees Among Class Counsel

Class counsel requests that the court order attorneys' fees to be distributed amongst the three firms representing the class in accordance with their agreement. (*See* Doc. No. 180 at 2.) The final proposed allocation of attorneys' fees amongst the firms, as agreed to by each of the class counsel, is 5.19 percent to Dowling Aaron Inc., 3.84 percent to Marko & Magolnick, P.A., and 90.97 percent to Payne & Fears LLP. (Doc. No. 185 at 2.) Courts typically look to the "'relative efforts of, and benefits conferred upon the class by, co-counsel' when deciding whether to accept" a proposed fee allocation amongst co-counsel. *Keller v. NCAA*, No. C 09-1967 CW, C 09-3329 CW, 2015 WL 8916392, at *4 (N.D. Cal. Dec. 15, 2015) (quoting *In re FPI/Agretech Secs. Litig.*, 105 F.3d 469, 474 (9th Cir. 1997)). Here, considering the hours each firm devoted to this litigation as detailed above, along with the agreement of class counsel on the matter, the court will grant the fee allocation proposed by class counsel.

### C.     Expenses of Class Counsel

Additionally, class counsel seeks to recover the costs expended on this litigation. Expense awards "should be limited to typical out-of-pocket expenses that are charged to a fee paying client and should be reasonable and necessary." *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007). These can include reimbursements for "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees." *Id.*

Attorney Cordero reports that his firm incurred costs of $123,108.08, including $20,095.84 on mediation expenses, $61,265.95 on experts and consultants, $11,586.23 on court reporter and transcript-related expenses for twelve of the thirteen depositions taken, and

$17,395.83 in travel expenses, among other costs. (Doc. No. 179-3 at ¶ 22.)  Additionally, attorney Cordero requests the court approve an additional $1,200 for future expenses, to be available for any costs incurred during subsequent administration of the settlement.[2]  (Doc. No. 179-3 at ¶ 22(e).)  Attorney Magolnick declares he spent $9,229.46 in expenses on the case, including travel, transportation, and lodging expenses for two mediations and one deposition. (Doc. No. 179-6 at ¶ 16.)  Finally, attorney Fischbach relates his firm advanced costs associated with the litigation in the amount of $4,302.28 for delivery services, hearing transcripts, mediators, photocopying, filing fees and court costs, and travel.  (Doc. No. 179-7 at ¶ 12.)  The court finds these expenses to be reasonable and will approve them.  The court therefore will direct that $123,108.08 be paid from the settlement fund to attorney Cordero's firm Payne & Fears; that $9,229.46 be paid from the settlement fund to attorney Magolnick's firm Marko & Magolnick; and that $4,302.28 be paid from the settlement fund to attorney Fischbach's firm Dowling Aaron, Inc.  Additionally, the settlement administrator shall establish an expense reserve from the common fund of an additional $1,200 to be used to reimburse attorney expenses incurred during administration of the settlement, if any.  Any unspent portion of this amount shall be added back into the common fund.

### D.      Fee-Sharing With Referral Attorney

Class counsel indicated in a footnote in their attorneys' fee motion that "[t]he parties have agreed, subject to the Court's approval, to remit 3.33 percent of their respective shares to Frank Owen, the Florida attorney that originally worked with Cordero to develop the case."  (Doc. No. 180-1 at 26 n.10.)  Attorney Cordero further explains in a declaration that "[t]his goodwill payment . . . is in recognition of the fact that Mr. Owen indirectly assisted me in originating this matter."  (Doc. No. 179-3 at 11.)  As discussed at the final fairness hearing, attorney Owen is not class counsel here and did not assist in the active litigation of this case.  Class counsel advised that they seek court approval to pay Owen what is essentially a referral fee, and are not seeking an award of attorneys' fees to him under Rule 23.  The court requested further briefing addressing

---

[2]  Any amount unspent is to be added to the common fund.

the necessity for such court approval and the authority pursuant to which the court could grant that approval.  Plaintiff filed the requested briefing on September 11, 2017.  (Doc. No. 188.)

Federal courts follow what is known as the American Rule, wherein "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.") *Baker Botts L.L.P. v. ASARCO LLC*, ___ U.S. ___, ___, 135 S. Ct. 2158, 2164 (2015) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53 (2010)).  In common fund cases, district courts "have the power to award attorneys' fees 'in the exercise of their equitable powers.'" *Wininger v. SI Mgmt. LP*, 301 F.3d 1115, 1120 (9th Cir. 2002) (quoting Hall v. Cole, 412 U.S. 1, 5 (1973)); *see also Rodriguez v. Disner*, 688 F.3d 645, 653 (9th Cir. 2012) (describing the common fund doctrine as "a traditional equitable doctrine 'rooted in concepts of quasi-contract and restitution.'") (quoting *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 770 (9th Cir. 1977)).  So long as the court has jurisdiction over the fund itself, there is no requirement that the work being compensated be within "the strict confines of the litigation immediately before the court." *Wininger*, 301 F.3d at 1121.  The guiding principle the court should look to is whether "the non-litigation work was calculated to—and in fact did—bring about the common fund presently under the district court's control."  *Id.* at 1121 n.3.

Here, the court accepts the representation of class counsel that attorney Owen contributed to the ultimate creation of this common fund by helping attorney Cordero originate this case.  Given counsel's representation that attorney Owen helped to develop the case, the agreement of both other class counsel to the fee-sharing arrangement, and the absence of any objections raised by defendants, the class representative, or class members, the court will exercise its discretionary equitable powers and approve the proposed fee-sharing arrangement.  Accordingly, each class counsel is hereby directed to provide attorney Owen with 3.33 percent of their respective award of attorneys' fees, pursuant to their agreement.

### D.    Payment to Class Counsel Over Time

Class counsel requested at the hearing that this court direct the settlement administrator to establish a qualified settlement fund under Internal Revenue Code § 468B for purposes of paying attorneys' fees, if any attorney wishes to receive their fee in periodic payments rather than a lump

1    sum.  The court will grant class counsel's request and, if counsel request the settlement

2    administrator make payments in a periodic manner, the settlement administrator is hereby

3    directed to establish a qualified settlement fund under 26 U.S.C. § 468B.

4                    **INCENTIVE PAYMENTS FOR CLASS REPRESENTATIVES**

5            Plaintiff seeks an incentive payment of $15,000 for its service as a class representative in

6    this action.  While incentive awards are "fairly typical in class action cases," they are

7    discretionary sums awarded by the court "to compensate class representatives for work done on

8    behalf of the class, to make up for financial or reputational risk undertaken in bringing the action,

9    and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v.*

10   *West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *Staton*, 327 F.3d at 977 ("[N]amed

11   plaintiffs . . . are eligible for reasonable incentive payments.").  Such payments are to be

12   evaluated individually, and should look to factors such as "the actions the plaintiff has taken to

13   protect the interests of the class, the degree to which the class has benefitted from those actions, .

14   . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and

15   reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*,

16   142 F.3d 1004, 1016 (7th Cir. 1998)).  Such awards must be "scrutinize[d] carefully . . . so that

17   they do not undermine the adequacy of the class representatives." *Radcliffe v. Experian Info.*

18   *Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).  Thus, incentive awards which are explicitly

19   conditioned on the representatives' support for the settlement, as well as those that are

20   significantly higher than the average amount awarded in settlement, should often not be approved.

21   *Id.* at 1164–65.  The core inquiry is whether an incentive award creates a conflict of interest, and

22   whether plaintiffs "maintain a sufficient interest in, and nexus with, the class so as to ensure

23   vigorous representation." *In re Online DVD-Rental*, 779 F.3d at 943.

24           Here, plaintiff has presented a declaration from Henry E. LeVine, Jr., the president and

25   administrator of Dakota Medical, Inc., detailing his involvement with this case.  LeVine notes

26   that he retained Darryl Cordero of Payne & Fears to represent plaintiff and the class in this

27   lawsuit in 2014.  (Doc. No. 179-2 at ¶ 6.)  LeVine reviewed and approved the co-counsel

28   agreement that was signed between Cordero and attorneys Fischbach and Magolnick.  (*Id.*)

LeVine avers he knows of no conflicting interests between the class and plaintiff, and has exercised his independent judgment to pursue resolution in the best interests of the class.  (*Id.* at ¶ 8.)  He has kept abreast of case developments, coordinated the collection of documents, assisted with interrogatory responses, and appeared for deposition.  (*Id.* at ¶ 9.)  According to LeVine, he attended the first of the mediations, and was available by telephone and e-mail throughout the second mediation.  (*Id.* at ¶¶ 10–11.)  LeVine devoted approximately sixty to seventy hours of work to this litigation over its course, and was not provided with or promised financial consideration for doing so.  (*Id.* at ¶ 12.)  In light of this involvement in the litigation, plaintiff requests a $15,000 incentive payment.

The average net settlement recovery per class member will be approximately $1,300. Therefore, an incentive award of $15,000 is more than ten times what the average class member could expect to receive in this litigation.  Moreover, because of the nature of this litigation, plaintiff bears little associational or reputational risk.  Further, because plaintiff does not do business with the defendants, there is no real risk of jeopardizing its business relationships by pursuing this case.  An award of $15,000 reflects compensation for the time devoted by Mr. LeVine to the litigation at the rate of between $215 and $250 per hour.  These factors might be viewed as supporting a somewhat lower incentive payment than that requested.

That said, plaintiff has also presented declarations from several class members indicating strong support for both the settlement and the requested incentive award.  (*See, e.g.*, Doc. No. 179-15 at ¶¶ 5–7 (Decl. of Cranwell, in-house counsel for American HealthCare, LLC); Doc. No. 179-29 at ¶ 6 (Decl. of Creagh, general counsel of Grane Healthcare Co.); Doc. No. 179-34 at ¶¶ 6–7 (Decl. of Lane, in-house counsel for Rockport Healthcare Services).)  Moreover, a number of the class members will be receiving large payouts from the settlement, given the number of facilities and fax numbers that received the junk faxes at each organization.  (*See, e.g.*, Doc. No. 179-27 at ¶ 7 (Golden Living Centers will receive almost $300,000 from the settlement); Doc. No. 179-34 at ¶ 6 (Rockport Healthcare Services anticipates receiving $80,000 from the settlement); Doc. No. 179-36 at ¶ 6 (Windsor assisted living facilities will receive $30,000 from the settlement).)  Ultimately, the proposed incentive payment is not far outside the amounts

previously approved by courts under similar circumstances. *See, e.g.*, *Taylor v. FedEx Freight, Inc.*, No. 1:13-cv-01137-DAD-BAM, 2016 WL 6038949, at *8 (E.D. Cal. Oct. 13, 2016) (approving a $10,000 incentive award where average awards were estimated to be $2,616); *Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014) (approving $15,000 incentive payments for average recovery of $3,700); *Clayton v. Knight Transp.*, No. 1:11-cv-00735-SAB, 2014 WL 1154098 at *2, 6 (E.D. Cal. Mar. 21, 2014) (awarding $3,500 incentive payment where the average recovery was approximately $150); *Davis v. Brown Shoe Co., Inc.*, No. 1:13-cv-01211-LJO-BAM, 2015 WL 6697929 at *12 (E.D. Cal. Nov. 3, 2015) (approving $7,000 incentive payments where the average class recovery was approximately $400).

Considering it is far smaller than a number of payments that will be made to individual class members, and given the support for the requested incentive award from class members, the court will award plaintiff Dakota Medical the requested $15,000 incentive payment.

**CONCLUSION**

Given the foregoing:

1. Plaintiff's motion for final approval of the settlement and certification of the settlement class (Doc. No. 179) is granted, the settlement class is certified, and the court approves the settlement as fair, reasonable, and adequate;

2. C. Darryl Cordero of Payne & Fears LLP, Donald R. Fischbach of Dowling Aaron, Inc., and Joel S. Magolnick of Marko & Magolnick P.A. are confirmed as class counsel; plaintiff is confirmed as class representative; and KCC LLC is confirmed as the settlement administrator;

3. Settlement administrator KCC is directed to send an additional deficiency notice to class members entitled to payments of more than $600 requesting their TINs, and may pay any class members who fail to respond in annual installments of less than $600 until the full amount due to each class member is paid;

4. Within twenty (20) days of service of this order, defendants shall deposit $24,935,000, representing the balance of the $25,000,000 fund not already deposited for notice and settlement administration costs, in an account established by the settlement administrator.

The settlement administrator has filed a report setting forth eligible class members and their respective shares of the settlement. (Doc. No. 187-1.) The settlement administrator shall distribute the proceeds of the settlement fund, after deducting its costs, attorneys' fees and expenses, and incentive payments as set forth below, to the class members in accordance with the settlement agreement;

5. Class counsel's motion for attorneys' fees (Doc. No. 180) is hereby granted, the court approves the proposed fee allocation (Doc. No. 185), and $8,333,333 is hereby awarded from the common fund to class counsel, to be divided as follows:

   a. Dowling Aaron, Inc. shall receive 5.19 percent of the total fee award, or $432,499.99;

   b. Marko & Magolnick, P.A. shall receive 3.84 percent of the total fee award, or $319,999.98; and

   c. Payne & Fears LLP shall receive 90.97 percent of the total fee award, or $7,580,833.03;

   d. Each firm named as class counsel in this matter shall remit 3.33 percent of their respective fee awards to attorney Frank Owen;

6. Class counsel's expenses are approved, and class counsel are to be awarded the following amounts from the common fund:

   a. Dowling Aaron, Inc. is awarded $4,302.28;

   b. Marko & Magolnick, P.A. is awarded $9,229.46;

   c. Payne & Fears LLP is awarded $123,108.80; and

   d. The settlement administrator is directed to establish an expense reserve from the common fund of $1,200 to be used to reimburse attorney expenses incurred during settlement administration, if any, with unused portion returned to the common fund after the initial distribution;

7. The settlement administrator is hereby directed to establish a qualified settlement fund under 26 U.S.C. § 468B, if any class counsel advises the administrator of a desire to receive periodic payments in lieu of a lump sum payment of attorneys' fees;

8. The motion for an incentive payment for plaintiff and class representative Dakota Medical (Doc. No. 181) is granted and plaintiff is awarded a $15,000 incentive payment to be paid from the common fund;

9. The settlement administrator has been paid $22,311 for the costs of notice and settlement administration through July 31, 2017, and this sum is approved. The settlement administrator shall be paid an additional amount, not to exceed $94,069 from the common fund for the costs of settlement administration from August 1, 2017 through the initial distribution and subsequent report to the court;

10. The parties and the settlement administrator shall advise the court within 21 days following the lapse of the time in which to negotiate settlement checks set forth in ¶ 11(A) of the settlement agreement (Doc. No. 171) whether undistributed funds from this settlement remain, and if so, whether the parties intend to seek a further distribution to class members or will move the court for a *cy pres* distribution;

11. All parties are directed to abide by the settlement agreement (Doc. No. 171), including any deadlines or procedures for distribution included therein, and take all necessary steps to complete and administer the settlement in accordance therewith; and

12. The court retains jurisdiction to consider any further applications arising out of or in connection with the settlement.

IT IS SO ORDERED.

Dated:   **September 20, 2017**

_____
UNITED STATES DISTRICT JUDGE